UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | No. 25-cr-31 (BAH) |
| | : | |
| ADRIAN THOMPSON, | : | |
| | : | |
| Defendant | : | |

# OPPOSITION TO MOTION TO DISMISS INDICTMENT

Defendant seeks dismissal of his indictment for Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year (18 U.S.C. § 922(g)(1)), claiming that under *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), and *United States v. Rahimi*, 144 S. Ct. 1889 (2024), § 922(g)(1) is unconstitutional, both facially and as applied. Defendant's claims fail. Binding D.C. Circuit precedent establishes that § 922(g)(1) is constitutional as to all felons, regardless of dangerousness. *See Medina v. Whitaker*, 913 F.3d 152, 160 (D.C. Cir. 2019). *Bruen* and *Rahimi* confirmed, rather than abrogated, *Medina*'s holding. Even if § 922(g)(1) were considered anew, the statute fits comfortably within the historical tradition of firearm regulation, because

it is "consistent with the principles that underpin our regulatory tradition." *Rahimi,* 144 S. Ct. at 1898.

## BACKGROUND

On Saturday, June 1, 2024, members of the Metropolitan Police Department (MPD) Violent Crime Suppression Division (VCSD) Robbery Suppression Unit (RSU) were working the evening tour of duty assigned to the Robbery Suppression Initiative in MPD's Sixth District. All RSU members were dressed in plainclothes and wearing outer vests with police markings and police body worn cameras.

Shortly after 11:18 p.m., Sergeant Scott Possinger and Investigator Wilfredo Guzman were patrolling the Clay Terrace neighborhood. While in the neighborhood, Sergeant Possinger and Investigator Guzman observed a parked blue Audi Q8 bearing Virginia temporary tag 68184C in the parking area directly in front of 323 53rd Street, NE, Washington, DC.

The blue Audi can be seen on surveillance footage reversing into the parking area from the apartment complex located at 314 53rd Street, NE at 11:12 p.m. **(Figure 1).** After the vehicle parks, two females approach the vehicle and one of them opens the front passenger door.



**Figure 1**

Surveillance footage at 11:14 p.m. then shows what appears to be the driver of the vehicle, who is not a defendant in this case, standing outside of the front driver's side door and one female speaking to an individual in the front passenger seat of the vehicle. **(Figure 2).** The woman standing in front of the front passenger door then closes the front passenger side door and walks away from the vehicle. **(Figure 3).**



Figure 2



Figure 3

Shortly thereafter, surveillance footage shows the patrol vehicle with both Sergeant Possinger and Investigator Guzman pull into the parking lot at 11:18 p.m. Sergeant Possinger observed the individual in the driver's seat exit the Audi and the defendant, Adrian Thompson, exit the front passenger seat of the Audi. **(Figure 4a & 4b).**



**Figure 4a**




**Figure 4b**

After both men exited the vehicle, they walked away from the Audi and Sergeant Possinger's MPD vehicle. Sergeant Possinger exited his vehicle and looked through the partially opened front driver's window with his flashlight of the unoccupied Audi and observed a large, clear plastic bag containing suspected marijuana. The marijuana was later field tested and weighed approximately 6.17 ounces. **(Figure 5).**




**Figure 5**

Sergeant Possinger asked the driver of the vehicle, who was still nearby, if he could speak with him to explain that he was going to search the Audi. The driver, later identified as Dion Dempsey,[1] voluntarily walked to speak to Sergeant Possinger, who explained that the amount of marijuana visible inside of the Audi was illegal, and that a further search of the vehicle would be conducted to search for additional

[1] Dempsey was initially charged with the gun possession in District of Columbia Superior Court case No. 2024-CF2-005378. Defendant Thompson's Superior Court gun case was no-papered. The Superior Court case against Dempsey was subsequently dismissed.

marijuana. On BWC footage, Dempsey initially appears to acknowledge that he had more than 2 ounces of marijuana under the seat after he states, "Yeah" **(Figure 6)**, but then denies that the amount of marijuana is in excess of two ounces.




**Figure 6**

At that time, Dempsey protested the search and mentioned that the registered owner of the car was his aunt; later investigation revealed Dempsey was actually the registered owner of the vehicle. As Sergeant Possinger unlocked the driver's door of the Audi through the partially opened window, Dempsey walked away from Sergeant Possinger and

then began to flee on foot. Sergeant Possinger conducted a further search of the vehicle and located a black handgun in the glovebox **(Figure 7).**




**Figure 7**

While the search was ongoing and shortly after Dempsey, the driver fled on foot, he was apprehended by other investigators several blocks away, in the backyard of a residence. Since defendant Thompson was observed exiting the Audi at the same time as Dempsey and was still standing in the courtyard near the parked vehicle, defendant Thompson was detained. Investigator Guzman recovered the marijuana and the firearm from the vehicle.

The firearm was identified as a Glock model 30S .45 caliber, had an obliterated serial number, 1 round of ammunition in the chamber of the weapon, and 11 rounds of ammunition in a 13-round magazine that was inserted in the weapon. **(Figure 8).**




***Figure 8***

Swabs from the firearm and magazine were submitted for DNA testing. The results were as follows. DNA from the firearm is a mixture of five or more individuals and is not suitable for comparison. DNA results from the magazine were interpreted as originating from four

individuals and are 130 trillion times more likely if defendant Thompson and three unknown, unrelated people are contributors than if four unknown, unrelated people are contributors. Dempsey was excluded as a contributor.

Thompson was also in possession of $236 in U.S. currency. The recovered suspected marijuana was located on the floorboard of the driver's seat with a black digital scale. It was field tested by RSU Investigator DaVon Thomas and gave a positive color indication for the presence of Tetrahydrocannabinol, the psychoactive ingredient in cannabis. The amount of recovered marijuana – approximately 175 grams, or 6.17 ounces – is greater than the legal limit of 2 ounces for individual possession in Washington, D.C. The amount recovered is consistent with distribution and not for personal use.

On January 28, 2025, a grand jury for the United States Court for the District of Columbia returned a one-count indictment against defendant Thompson for violation of 18 U.S.C. § 922(g)(1) (Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year).

## Argument

### I. *Bruen* and *Rahimi* Do Not Upend Binding Precedent Affirming the Constitutionality of Section 922(g)(1).

Defendant asserts that under *Bruen* and *Rahimi*, § 922(g)(1) violates the Second Amendment. Contrary to defendant's claim, the D.C. Circuit's precedent upholding § 922(g)(1) remains binding on this Court.

#### A. *Bruen*, *Rahimi*, and the Relevant Legal Framework

In *Bruen*, the Supreme Court considered a challenge made by two "law-abiding, adult citizens" to New York's requirement that, to obtain a license to carry a concealed firearm outside the home or place of business for self-defense, one must prove to the licensing officer that "proper cause exists" to issue it. 597 U.S. at 12, 15–17. "Proper cause" was not defined by statute but had been interpreted by New York courts to require proof of a "special need for self-protection distinguishable from that of the general community." *Id.* at 12 (quotation marks and citation omitted). This was a "demanding" standard. *Id.* Living or working in a high-crime area was not enough; instead, applicants typically needed "evidence of

particular threats, attacks, or other extraordinary danger to personal safety." *Id.* at 13 (cleaned up).

The Supreme Court held that New York's "proper cause" requirement violates the Second Amendment. In doing so, the Court noted the then-prevailing two-step test fashioned by the lower courts after *District of Columbia v. Heller*, 554 U.S. 570 (2008), under which courts would (1) determine whether the regulated conduct fell within "the original scope of the [Second Amendment] right based on its historical meaning," and if so, (2) engage in a means-end balancing inquiry whether the challenged regulation could satisfy either strict or intermediate scrutiny, depending on whether the regulation burdened the "core" Second Amendment right. *Bruen*, 597 U.S. at 17–18 (cleaned up). *Bruen* disapproved this two-step test. Specifically, *Bruen* held that

> this two-step approach[ ] is one step too many. Step one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history. But *Heller* and *McDonald* [*v. City of Chicago*, 561 U.S. 742 (2010),] do not support applying means-end scrutiny [*i.e.*, step two,] in the Second Amendment context.

*Id.* at 19. *Bruen* explained that it was *applying*, rather than expanding or otherwise altering, the same test set forth in *Heller* to assess Second

Amendment claims: "The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Bruen*, 597 U.S. at 26. *See also id.* at 27 (indicating that the Court was "[f]ollowing the course charted by *Heller*"). The Court simply made the *Heller* test "more explicit," by clarifying that courts should evaluate firearm laws based only upon a "text and history" inquiry, without conducting an additional interest-balancing, means-end inquiry. *Id.* at 20–24, 31.

In applying the text-and-history test in *Bruen*, the Supreme Court first concluded that the Second Amendment's text protected conduct governed by New York's "proper cause" requirement. The Court reiterated *Heller's* holding that the text of the Second Amendment protected "the right of law-abiding, responsible citizens to use arms for self-defense," *Bruen*, 597 U.S. at 26 (cleaned up). Moreover, the Court held that this right applies outside the home or place of business, such that the "proper cause" licensing requirement infringed upon it. *Id.* at 31–34.

Second, because the Second Amendment's "text" protected conduct governed by the "proper cause" requirement, the Supreme Court considered whether New York could show that this requirement was "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 33–34. The Court agreed that "[t]hroughout modern Anglo-American history, the right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms." *Id.* at 38. Nonetheless, there was not "a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense," or of "limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense." *Id.* Accordingly, the Court held, "[u]nder *Heller*'s text-and-history standard, the proper-cause requirement is therefore unconstitutional." *Id.* at 39.

In *United States v. Rahimi*, 144 S. Ct. 1889 (2024), the Court further clarified the proper inquiry. *Rahimi* involved a Second Amendment challenge to 18 U.S.C. § 922(g)(8), which disarms individuals subject to certain domestic violence protective orders. In

upholding that law, the Supreme Court observed that "some courts have misunderstood the methodology of our recent Second Amendment cases." *Rahimi*, 144 S. Ct. at 1897. Those cases, the Court explained, "were not meant to suggest a law trapped in amber." *Id.* Instead, "the appropriate analysis involves considering whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition." *Id.* at 1898 (emphasis added). For instance, "if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations." *Id.* But even "when a challenged regulation does not precisely match its historical precursors, it still may be analogous enough to pass constitutional muster," so long as the law "comport[s] with the principles underlying the Second Amendment[.]" *Id.* In applying this standard, the Court reiterated that "many . . . prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.'" *Id.* at 1902 (quoting *Heller*, 554 U.S. at 626, 627 & n.26).

As to § 922(g)(8), the Court held that its constitutionality was supported by historical surety laws, which authorized magistrates to

"require individuals suspected of future misbehavior to post a bond," and by historical "going armed" laws, which "provided a mechanism for punishing those who had menaced others with firearms." *Rahimi*, 144 S. Ct. at 1900-1901. "Taken together," the Court explained, "the surety and going armed laws confirm what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id.* at 1901. Although § 922(g)(8) "is by no means identical to these founding era regimes," it nevertheless "fits neatly within the tradition the surety and going armed laws represent." *Id.* Because the provision was constitutional as applied to Rahimi, the Court also rejected his facial challenge. *Id.* at 1898.

### B. D.C. Circuit Precedent Upholding § 922(g)(1) Remains Good Law.

In *Medina v. Whitaker*, 913 F.3d 152, 160 (D.C. Cir. 2019), the D.C. Circuit unequivocally held that pursuant to the Supreme Court's guidance in *Heller*, "a felony conviction [regardless of dangerousness] removes one from the scope of the Second Amendment," and thus a constitutional challenge to § 922(g)(1) fails the *first* step of the then-existing constitutional analysis. Medina, who had been convicted of a

nonviolent felony, *i.e.*, making a false statement to a lending institution, in violation of 18 U.S.C. § 1014, claimed that § 922(g)(1) violated the Second Amendment as applied to him, "because he poses no heightened risk of gun violence." *Medina*, 913 F.3d at 154.[2] The D.C. Circuit "reject[ed] this contention," "[b]ecause . . . felons are not among the law-abiding, responsible citizens entitled to the protections of the Second Amendment." *Id.* Consistent with the Supreme Court's later guidance in *Bruen*, *Medina* explained that "we must look to tradition and history. . . . The Second Amendment was ratified in 1791, so we look to the public understanding of the right at that time to determine if a convicted felon would fall outside the scope of its protection." *Id.* at 158. The D.C. Circuit carefully surveyed the founding-era treatment of felonies, under which even nonviolent felonies were punishable by death. *Id.* And the court

[2] The D.C. Circuit appeared to agree that Medina was not a dangerous person; the court noted that his only other criminal record involved misdemeanor false statements on a Wyoming hunting license application; he "owns a successful business, supports a family, and engages in philanthropy"; and "[h]is rehabilitation has been recognized by several important institutions," including "[e]ven the victim of [his felony] false statement, [a mortgage lender that subsequently] recognized his trustworthiness . . . by extending him a $1,000,000 line of credit." *Medina*, 913 F.3d at 154.

relied upon the Supreme Court's repeated assurances that felon prohibitions remain lawful after *Heller*. *Id. See also id.* at 155 ("In *Heller*, and again in *McDonald*[ ], the Court explained that the recognition of an individual right to bear firearms does not cast doubt on longstanding prohibitions on the possession of firearms by felons. The practice of barring convicted felons from possessing firearms is a presumptively lawful regulatory measure.") (internal quotation marks and citations omitted); *Wrenn v. District of Columbia*, 864 F.3d 650, 659 (D.C. Cir. 2017) ("the Supreme Court has taught in *Heller*[ ] that legal regulations of possession or carrying that are 'longstanding'—including bans on possession by felons . . . —reflect limits to the preexisting right protected by the [Second] Amendment"). Thus, *Medina* held,

> On balance, the historical evidence and the Supreme Court's discussion of felon disarmament laws leads us to reject the argument that non-dangerous felons have a right to bear arms. As a practical matter, this makes good sense. Using an amorphous "dangerousness" standard to delineate the scope of the Second Amendment would require the government to make case-by-case predictive judgments before barring the possession of weapons by convicted criminals, illegal aliens, or perhaps even children. We do not think the public, in ratifying the Second Amendment, would have understood the right to be so expansive and limitless. . . . For these reasons, we hold that those convicted of felonies are not among those entitled to possess arms.

*Id.* at 159–60. Accordingly, the court explained, "[b]ecause [Medina's] claim fails at the first step of the [then-prevailing two-step] analysis, we need not reach the second step." *Id.* at 161. *Medina* thus did not predicate its ruling upon the second-step interest-balancing test that was later rejected in *Bruen*.

*Medina* remains binding on this Court. *Medina* relied exclusively on the first-step analysis that *Bruen* reaffirmed as the only correct basis for evaluating a Second Amendment challenge. *See United States v. Johnson*, 158 F.4th 200, 209 (D.C. Cir. 2025) ("*Medina* held, based on a historical analysis of the meaning of the Second Amendment at the time of its ratification, that felons are not protected by the Second Amendment. Bruen endorsed that first-step analysis."); *see also Bruen*, 597 U.S. at 19 ("Step one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history."). Accordingly, *Bruen* did not abrogate *Medina*'s holding, but in fact confirmed it.

*Rahimi* did not abrogate *Medina* either. To the contrary, as discussed below, *Rahimi* reiterated the Court's repeated assurances that *Heller* and its progeny did not call into question laws categorically

prohibiting felons from possessing firearms. *Medina* grounded its ruling on these assurances. 913 F.3d at 159.[3]

*Medina* thus controls the outcome here. *See, e.g., United States v. Torres*, 115 F.3d 1033, 1036 (D.C. Cir. 1997) ("Just as we leave to the Supreme Court the prerogative of overruling its decisions, district judges, like panels of this court, are obligated to follow controlling circuit precedent until either we, sitting en banc, or the Supreme Court, overrule it. That a district judge disagrees with circuit precedent does not relieve him of this obligation whether or not the precedent has been embraced by our sister circuits.") (cleaned up). *See also Lewis*, No. 24-CR-144 (LLA), 2024 WL 3581347, at *2 ("As the [district] court explained in *Richardson*, "[*Bruen*'s] refinement of the historical method applied in *Medina* does not

[3] Accordingly, it is of no moment that *Medina* also pointed out that felons were not "responsible" citizens, 913 F.3d at 154, or that it noted (without "need[ing to] accept th[e] theory outright") the "ongoing debate" about the "virtuous citizen" theory of disarmament, *id.* at 159. Nor does the D.C. Circuit's recent decision on plain-error review holding that *if* the door remains open to an as-applied challenge after *Medina*, the opening is exceedingly limited: *Medina* made clear that "nonviolent fraud convictions are not sufficiently 'minor or regulatory' to succeed on an as-applied challenge," so "convictions for violent crimes do not come close." *Johnson*, 158 F.4th at 210. *Johnson* did not resolve whether *Medina* actually left the door open to an as-applied challenge.

'clearly dictate a departure' from *Medina* such that this Court could conclude it had been overruled." 2024 WL 402948, at *4 (quoting *Bahlul v. United States*, 77 F.4th 918 (D.C. Cir. 2023) ("For a panel to reconsider a prior decision of this court in favor of a new Supreme Court precedent, the Court's intervening decision must effectively overrule, *i.e.*, eviscerate, the law of our circuit.") (cleaned up))).[4]

---

[4] District court judges in this District have consistently rejected claims that § 922(g)(1) violates the Second Amendment under *Bruen* or *Rahimi*. *See, e.g.*, *United States v. Clark*, No. 25-cr-113 (BAH) (D.D.C. Mar. 4, 2026) (minute order); *United States v. Darkwah*, No. 25-cr-194 (LLA), 2026 WL 179662 (D.D.C. Jan. 21, 2026) (collecting cases); *United States v. Speaks*, No. 25-cr-217 (JDB), 2025 WL 3701958 (D.D.C. Dec. 19, 2025); *United States v. Davon Sargent*, No. 24-cr-447 (ABJ) (D.D.C. May 21, 2025) (ECF No. 29) (collecting cases); *United States v. Turman*, No. 23-cr-171 (JMC) (D.D.C. Dec. 2, 2024); *United States v. Johnson,* No. 24-CR-32 (JMC) (D.D.C. Aug. 9, 2024); *United States v. Lewis*, No. 24-CR-144 (LLA), 2024 WL 3581347 (D.D.C. July 29, 2024); *United States v. Richardson*, No. 23-CR-200-1 (JDB), 2024 WL 402948 (D.D.C. Feb. 2, 2024) (collecting cases); *United States v. Booker*, No. 23-CR-103 (RJL) (D.D.C. Nov. 1, 2023); *United States v. Shelton*, No. 22-CR-201 (RBW) (D.D.C. Sept. 15, 2023); *United States v. Thompson*, No. 22-CR-104 (RBW) (D.D.C. Sept. 15, 2023); *United States v. Wilcox*, No. 23-CR-136 (DLF) (D.D.C. Sept. 13, 2023); *United States v. Stewart*, No. 22-CR-154 (CRC) (D.D.C. Sept. 7, 2023); *United States v. Byrd*, No. 22-CR-309 (TNM) (D.D.C. Sept 6, 2023);*United States v. Remy*, No. 23-CR-159 (TJK) (D.D.C. Aug. 22, 2023); *United States v. Ingraham*, No. 22-CR-211 (TJK) (D.D.C. Aug. 3, 2023); *United States v. Glover*, No. 20-CR-204 (ABJ) (D.D.C. Jul. 19, 2023); *United States v. Bailey*, No. 22-CR-269 (BAH) (D.D.C. Jun. 14, 2023); *United States v. Tatum*, No. 22-CR-120 (DLF)

(continued . . . )

### C. Other Circuits Have Generally Upheld § 922(g)(1).

Since *Rahimi*, other circuits confronting similar challenges have generally agreed with *Medina*, upholding the felon-in-possession statute against Second Amendment challenges. *See, e.g.*, *Zherka v. Bondi*, 140 F.4th 68, 93 (2d Cir. 2025) ("Because legislatures at or near the Founding had the authority to pass laws disarming large classes of people based on status alone, we conclude that the Second Amendment does not bar Congress from passing laws that disarm convicted felons, regardless of whether the crime of conviction is nonviolent."); *United States v. Hunt*, 123 F.4th 697 (4th Cir. 2024) (neither *Bruen* nor *Rahimi* support defendant's as-applied Second Amendment challenge to § 922(g)), *petition for cert. filed*, No. 24-6818 (U.S. Mar. 20, 2025); *United States v. Jackson*, 110 F.4th 1120, 1125 (8th Cir. 2024) ("we conclude that there is no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1)"); *United States v. Duarte*, 137 F.4th 743, 761 (9th Cir. 2025) (en banc) ("§ 922(g)(1)'s permanent and categorical disarmament of felons

---

(D.D.C. Mar. 22, 2023); *United States v. Whittaker*, No. 22-CR-272 (CRC) (D.D.C. Jan. 12, 2023).

is consistent with this Nation's historical tradition of firearm regulations"); *Vincent v. Bondi*, 127 F.4th 1263, 1265-66 (10th Cir. 2025) (*Vincent II*) (readopting *Vincent v. Garland*, 80 F.4th 1197 (10th Cir. 2023) (*Vincent I*), after *Rahimi* and rejecting as-applied challenge because neither *Bruen* nor *Rahimi* abrogated circuit precedent foreclosing such a challenge), *petition for cert. filed*, No. 24-1155 (U.S. May 12, 2025); *United States v. Dubois*, 139 F.4th 887, 893 (11th Cir. 2025) (holding that *Bruen* and *Rahimi* did not support Second Amendment challenge to felon disarmament law); *see also United States v. Langston*, 110 F.4th 408, 420 (1st Cir. 2024) (rejecting, on plain-error review, challenge to felon-in-possession statute because "the Supreme Court has stated repeatedly over sixteen years, from *Heller* to *Rahimi*, that felon-in-possession laws are presumptively lawful").

The post-*Rahimi* decisions from the Second, Fourth, Eighth, Ninth, and Eleventh Circuits all uphold § 922(g)(1) based on legal reasoning similar to that given in *Medina*, underscoring that *Medina* has not been undermined or overruled. Indeed, they all cite *Medina* favorably in support of their analysis. *See, e.g.*, *Zherka*, 140 F.4th at 81; *Hunt*, 123

F.4th at 706; *Jackson*, 110 F.4th at 1127; *Duarte*, 137 F.4th at 756; *Dubois*, 139 F.4th at 898 (W. Pryor, C.J., concurring).

Perhaps most similarly to the situation here, the Tenth Circuit in *Vincent II* held that its pre-*Bruen* precedent upholding § 922(g)(1) in *United States v. McCane*, 573 F.3d 1037 (10th Cir. 2009), remains binding after *Bruen* and *Rahimi*. The Tenth Circuit agreed that *Bruen* had abrogated cases in other circuits that had relied on the now-disapproved means-end balancing test. *Vincent I*, 80 F.4th at 1200 n.3. However, the court explained, "[u]nlike those circuits, we hadn't relied in *McCane* on the means or ends of the ban on felons' possession of firearms." *Id.* Accordingly, the court held that "[t]he district court was obligated to follow our precedent," and that a panel of the Circuit was also bound, because *Bruen* and *Rahimi* did not abrogate *McCane*, and in fact "didn't address the ban on felons' possession of firearms" at all. *Vincent I*, 80 F.4th at 1200–1201. "If anything," the court explained, *Bruen* contained "potential signs of support for these prohibitions." *Vincent I*, 80 F.4th at 1201–02; *see also Vincent II*, 127 F.4th at 1265. Accordingly, the Tenth Circuit held, *Bruen* and *Rahimi* did not "indisputably and pellucidly abrogate" its earlier precedent. *Vincent II*, 127 F.4th at 1265.

One circuit has reached a different conclusion, finding § 922(g)(1) unconstitutional as applied. *See Range v. Att'y Gen.*, 124 F.4th 218 (3d Cir. 2024) (en banc) (issuing a "narrow" ruling that § 922(g)(1) is unconstitutional as applied to a defendant who, in 1995, had pled guilty to a Pennsylvania misdemeanor of making a false statement to obtain food stamps). Two other circuits have indicated that as-applied challenges may be viable in some circumstances, while rejecting the as-applied challenges brought by the specific defendants in those appeals. *See United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024) (statute constitutional as applied to defendant with prior felony conviction for vehicle theft); *United States v. Williams*, 113 F.4th 637 (6th Cir. 2024) (statute constitutional as applied to defendant with prior felony conviction for aggravated robbery); *cf. United States v. Gay*, 98 F.4th 843, 846 (7th Cir. 2024) (reserving judgment on whether "there is *some* room for as-applied challenges"). As discussed below, however, those rulings are unpersuasive.

## II. Section 922(g)(1) Would Survive Renewed Scrutiny After *Bruen* in Any Event.

Even if this Court were inclined to take a fresh look at § 922(g)(1) in light of *Bruen's* analytical framework, defendant's Second Amendment challenge would fail. "State statutes, like federal ones, are entitled to the presumption of constitutionality until their invalidity is judicially declared." *Davies Warehouse Co. v. Bowles*, 321 U.S. 144, 153 (1944). Facial attacks on the constitutionality of a statute rarely succeed, because the challenger must "establish that no set of circumstances exists under which the [statute] would be valid." *Rahimi*, 144 S. Ct. at 1898 (cleaned up). At a minimum, § 922(g)(1) may be constitutionally applied to "people who have been convicted of a drive-by-shooting, carjacking, armed bank robbery, or even assassinating the President of the United States." *United States v. Canada*, 103 F.4th 257, 258-59 (4th Cir. 2024); *see also United States v. Gay*, 98 F.4th 843, 846-47 (7th Cir. 2024) (Section 922(g)(1) may be applied to someone who had "been convicted of 22 felonies, including aggravated battery of a peace officer and possessing a weapon while in prison"). Because "the government may constitutionally forbid people who have been found guilty of such acts

from continuing to possess firearms," *Canada*, 103 F.4th at 259, defendant's facial challenge necessarily fails.

In addition, defendant bears the burden to show that § 922(g)(1) infringes upon the Second Amendment right of law-abiding citizens to bear arms in self-defense.[5] Only then does "the burden fall[] on [the government] to show that [the challenged regulation] is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 33–34.

Defendant's claims fail at the outset because, unlike the petitioners in *Bruen*, he has never proffered that he possessed the gun for the purpose of lawful self-defense. *See Bruen*, 597 U.S. at 32–33 (course of conduct protected by the Second Amendment is that of "armed self-

[5] In explaining the proper Second Amendment analysis, *Bruen* analogized to "the freedom of speech in the First Amendment, to which *Heller* repeatedly compared the right to keep and bear arms." *Id*. at 24 (citing *Heller*, 554 U.S. at 582, 595, 606, 618, 634–635). Under the First Amendment's burden-shifting framework, the party challenging a regulation has the burden to show that the challenged provision implicates the First Amendment right, after which the government bears the burden to justify the purported restriction on the freedom of speech. "[I]t is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies." *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984).

defense"; "self-defense is 'the *central component* of the [Second Amendment] right itself'") (quoting *Heller*, 554 U.S. at 599) (emphasis in *Heller*). Nor is he entitled to a presumption to that effect, given that under *Bruen* he must first show that the Second Amendment regulates his proposed conduct. *See* 597 U.S. at 22-24.

Contrary to defendant's claim, the Supreme Court emphasized in *Heller*, reiterated in *McDonald*, and confirmed yet again in *Bruen* and *Rahimi* that these rulings do not call into question the constitutionality of laws that prohibit felons from possessing firearms. Accordingly, § 922(g)(1) is constitutional.

### A. The Supreme Court Has Repeatedly Indicated that Felon Disarmament Statutes Are Constitutional.

In its Second Amendment decisions, the Supreme Court has reiterated that felon disarmament statutes like § 922(g)(1) remain constitutional. *Heller* emphasized that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of

arms. 554 U.S. at 626-27. In *McDonald*, a plurality of the Court "repeat[ed]" its "assurances" that *Heller*'s holding "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons.'" 561 U.S. at 786 (quoting *Heller*, 554 U.S. at 626).

In *Bruen*, the Court confirmed yet again that the Second Amendment's limits applied only to restrictions on "law-abiding" persons. 597 U.S. at 26 (quoting *Heller*, 554 U.S. at 635); *see also id.* at 9, 15, 29, 31–32, 38, 60, 70–71. And three of the Justices in the majority reiterated that point in concurrences. *See id.* at 72–73, 78 (Alito, J., concurring) ("all we decide" is that "a state may not enforce a law . . . that effectively prevents its law-abiding residents from carrying a gun for [self-defense]"; *Bruen* "does not expand the categories of people who may lawfully possess a gun"; "the Second Amendment protects the right of ordinary law-abiding Americans to protect themselves" with firearms); *id.* at 80–81 (Kavanaugh, J., joined by Roberts, C.J., concurring) ("Properly interpreted, the Second Amendment allows a 'variety' of gun regulations," including "'prohibitions on the possession of firearms by felons'") (quoting *Heller*, 554 U.S. at 626–27, 636). Prohibiting felons from possessing firearms, which ensures that "those bearing arms" are "law-

abiding," accords with the Second Amendment. *Id.* at 38 n.9 (quoting *Heller*, 554 U.S. at 635).

Consistent with the understanding that the Second Amendment protects the rights of law-abiding citizens, *Bruen* approved "'shall-issue" licensing regimes that "require applicants to undergo a background check or pass a firearms safety course." 597 U.S. at 38 n.9; *see id.* at 80 (Kavanaugh, J., joined by Roberts, C.J., concurring) ("[S]hall-issue licensing regimes are constitutionally permissible[.]"). In doing so, the Court had no need to analyze the history of shall-issue licensing regimes. "Shall-issue" licensing regimes generally pass constitutional muster because "they do not necessarily prevent law-abiding" citizens from exercising their Second Amendment rights. *Id.* at 38 n.9. Instead, they "are designed to ensure only that those bearing arms . . . are, in fact 'law-abiding'" citizens. *Id.* This reasoning underscores that § 922(g)(1)—which directly aims to ensure that "those bearing arms" are "law-abiding" citizens—accords with the Second Amendment. *Id.*

*Heller* and its progeny's discussion of felons cannot be cast aside as dicta. Such an argument is foreclosed by D.C. Circuit precedent in *Medina* and *Wrenn*. As discussed above, both cases relied on this

language from *Heller* as delineating the scope of the Second Amendment as to felons. *Medina*, 913 F.3d at 155; *Wrenn*, 864 F.3d at 659. *Heller*, *McDonald*, *Bruen*, and *Rahimi* directly addressed the scope of the right protected by the Second Amendment, and in doing so clarified what regulations were consistent with the Second Amendment. As *Bruen* explained, in *Heller*, "[a]fter holding that the Second Amendment protected an individual right to armed self-defense, *we also relied on the historical understanding of the Amendment to demark the limits on the exercise of that right*." 597 U.S. at 21 (emphasis added).

Nor has *Heller*'s discussion of felons been superseded by *Bruen*'s explanation of the appropriate test for evaluating Second Amendment claims. Instead, *Bruen* "*appl*[*ied*]" "[t]he test that we set forth in *Heller*," not revised it. 597 U.S. at 26 (emphasis added). If *Bruen*'s effect were to disallow prohibitions as to felons that *Heller* had expressly authorized, one would expect the Court to have acknowledged this change. But instead, the *Bruen* majority instead repeatedly reiterated *Heller*'s analytical framework, including its recognition of permissible "limits on the exercise of that right." 597 U.S. at 21, 29–31.

### B. This Nation's History and Traditions Support Prohibitions Against Felons Possessing Firearms.

Even if the Supreme Court and the D.C. Circuit had not already upheld laws like § 922(g)(1) forbidding firearm possession by felons, a review of "this Nation's historical tradition of firearm regulation" would compel the same conclusion. *Bruen*, 597 U.S. at 17. As *Jackson* recognized, "[h]istory shows that the right to keep and bear arms was subject to restrictions that included prohibitions on possession by certain groups of people." 110 F.4th at 1126. "The historical record shows that gun safety regulation was commonplace in the colonies, and around the time of the founding, a variety of gun safety regulations were on the books." *Nat'l Rifle Ass'n of Am., Inc. v. Bur. of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 200 (5th Cir. 2012), *abrogated on other grounds* by *Bruen*, 597 U.S. 1. Those regulations "included safety laws . . . disarming certain groups and restricting sales to certain groups." *Id.* "For example, several jurisdictions passed laws that confiscated weapons owned by persons who refused to swear an oath of allegiance to the state or to the nation." *Id.*; *see also Medina*, 913 F.3d at 159 (explaining that "during the revolution, the states of Massachusetts and Pennsylvania

confiscated weapons belonging to those who would not swear loyalty to the United States"). *See generally* Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations*, 60 Hastings L.J. 1339, 1360 (2009) ("there is every reason to believe that the Founding Fathers would have deemed persons convicted of any of the common law felonies not to be among 'the people' to whom they were guaranteeing the right to arms") (cleaned up). Section 922(g)(1) fits comfortably within the Nation's longstanding tradition of disarming categorically dangerous citizens.[6]

[6] Justice Breyer's dissent in *Bruen* asserted that "prohibitions on the possession of firearms by felons . . . have their origins in the 20th century," and "Founding-era legislatures did not strip felons of their rights to bear arms simply because of their status as felons." *Id.* at 129 (Breyer, J., dissenting) (citations omitted). But a dissenting opinion lacks the power to delimit the impact of the majority's analysis, *see, e.g., Strange on Behalf of Strange v. Islamic Republic of Iran, Interest Section*, 964 F.3d 1190, 1197 (D.C. Cir. 2020) (a dissenting opinion is not precedent even as to questions unaddressed by majority, "because it does not tell us how a majority of the Court would decide the question") (quotation marks and citation omitted). Moreover, it does not matter whether felon-in-possession statutes are "of mid-20th century vintage." *See Nat'l Rifle*, 700 F.3d at 196, *abrogated on other grounds by Bruen*, 597 U.S. 1. *Heller*'s point in endorsing felon-in-possession laws, consistent with *Bruen*, was not that they had existed in their modern form since the founding but that they were sufficiently analogous to historical regulations to be deemed "longstanding." *See* 544 U.S. at 626–27. *See also Bruen*, 597 U.S. at 30 (approving "longstanding" laws

(continued . . . )

"Placed in the wrong hands, firearms present a grave threat to public safety, and for this reason, the Anglo-American right to bear arms has always recognized and accommodated limitations for persons perceived to be dangerous." *United States v. Carter*, 669 F.3d 411, 415 (4th Cir. 2012), *abrogated on other grounds by Bruen*, 597 U.S. 1. Indeed, "historical evidence support[s] the notion that government could disarm individuals who are not law-abiding members of the political community," such as convicted felons. *See United States v. Carpio-Leon*, 701 F.3d 974, 980 (4th Cir. 2012). "*Heller* identified . . . as a 'highly influential' 'precursor' to the Second Amendment the Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (quoting *Heller*, 554 U.S. at 604). That report recognized the permissibility of imposing a firearms disability on

---

prohibiting possession of firearms in "sensitive places"; "Although the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited—e.g., legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions. We therefore can assume it settled that these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment.").

convicted felons, stating that "citizens have a personal right to bear arms '*unless for crimes committed, or real danger of public injury.*'" *Id.* (quoting 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 662, 665 (1971)) (emphasis added).

For centuries, the gun rights of certain groups have been categorically limited to promote public safety. *Heller* identified the right protected by the 1689 English Bill of Rights as "the predecessor of our Second Amendment." 554 U.S. at 593. That document provided: "That the Subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and as allowed by Law." *Id.* (citing 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441). Both before and after its adoption, the English government retained the power to disarm individuals it viewed as dangerous. *See Carpio-Leon*, 701 F.3d at 980. Thomas M. Cooley's 1868 treatise, which *Heller* described as "massively popular," 554 U.S. at 616, later explained that some classes of people were "almost universally excluded" from exercising certain civic rights, including "the idiot, the lunatic, and the felon, on obvious grounds." Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which*

*Rest Upon the Legislative Power of the States of the American Union* 29 (1st ed. 1868).

Similarly, Samuel Adams offered an amendment at the Massachusetts convention to ratify the Constitution, recommending "that the said Constitution be never construed to authorize Congress . . . to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." Schwartz, *The Bill of Rights* 674–75, 681 (emphasis added). In the same vein, "[m]any of the states, whose own constitutions entitled their citizens to be armed, did not extend this right to persons convicted of crime." *Skoien*, 614 F.3d at 640.

Nor did the historical disqualification turn on whether the prior felony was considered a violent one. *See Medina*, 913 F.3d at 159 ("Felonies encompass a wide variety of non-violent offenses, and we see no reason to think that the [Supreme] Court [in *Heller*] meant 'dangerous individuals' when it used the word felon."); *Vincent*, 80 F.4th at 1202 ("we have no basis to draw constitutional distinctions based on the type of felony involved"). To the contrary, at the founding, even non-violent crimes involving mere deception, including forgery, embezzlement, and counterfeiting, were often classified as felonies punishable not just by

disarmament, but by death. *See Bucklew v. Precythe*, 587 U.S. 119, 129 (2019) ("[D]eath was 'the standard penalty for all serious crimes' at the time of the founding.") (citation omitted). The First Congress treated "forgery, [dealing in] forged securities, [and] counterfeiting" as capital crimes, *Folajtar v. Att'y Gen. of the United States*, 980 F.3d 897, 905 (3d Cir. 2020) (first alteration in original) (quoting John D. Bessler, *Cruel & Unusual: The American Death Penalty and the Founders' Eighth Amendment* 56-57 (2012)); several states, including New York and Maryland, subjected forgers to the death penalty;[7] and contemporary English law similarly categorized "counterfeiting" and "embezzlement" as punishable by execution, *Medina*, 913 F.3d at 158 (quotation marks omitted). In addition, at common law, felons generally also forfeited their lands, goods, and chattels. *See* 4 Blackstone 380-389. That rule—which reflected the belief that "property was a right derived from society which one lost by violating society's laws," *Austin v. United States*, 509 U.S. 602,

[7] See Thomas Herty, *A Digest of the Laws of Maryland* 255-56 (1799) (forgery punishable by "death as a felon, without benefit of clergy"); 2 *Laws of the State of New York* 74 (1791) (an individual convicted of forgery "shall be hanged by the neck until he . . . shall be dead"); *see also* 1 *The Laws of the Commonwealth of Massachusetts* 250, § 5 (1807) (forgery of bank bills may be punishable by death).

612 (1993)—took hold in the colonies. *See* Richard E. Finneran & Steven K. Luther, *Criminal Forfeiture and the Sixth Amendment: The Role of the Jury at Common Law*, 35 Cardozo L. Rev. 1, 35-41 (2013). As the D.C. Circuit recognized in *Medina*, "it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms." 913 F.3d at 158. And in *Rahimi*, the Supreme Court agreed that the availability of greater penalties is relevantly similar to the lesser penalty of disarmament. *See* 144 S. Ct. at 1900–02 ("The going armed laws provided for imprisonment," "and if imprisonment was permissible to respond to the use of guns to threaten the physical safety of others, then the lesser restriction of temporary disarmament that Section 922(g)(8) imposes is also permissible.").

Courts have reached similar conclusions in upholding other categorical restrictions similar to, but not included in, *Heller*'s non-exhaustive list of presumptively lawful regulations. *See, e.g., United States v. Rene E.*, 583 F.3d 8, 16 (1st Cir. 2009) (rejecting a Second Amendment challenge to 18 U.S.C. § 922(x), which restricts the ability of people under 18 to possess handguns); *United States v. Portillo-Munoz*,

643 F.3d 437, 439–40 (5th Cir. 2011) (holding that § 922(g)(5)'s prohibition of gun possession by illegal aliens does not violate the Second Amendment); *United States v. Yancey*, 621 F.3d 681, 684–87 (7th Cir. 2010) (same); *Bena*, 664 F.3d at 1184 (holding that § 922(g)(8)'s prohibition of gun possession by people under domestic-violence protective orders "is consistent with . . . common-law tradition"); *Skoien*, 614 F.3d at 640 (same); *United States v. Patterson*, 431 F.3d 832, 836 (5th Cir. 2005) ("Prohibiting unlawful drug users from possessing firearms is not inconsistent with the right to bear arms guaranteed by the Second Amendment."); *see also United States v. Costianes*, 2023 WL 3550972 (D. Md. May 18, 2023) ("join[ing] the majority of [district] courts that have held [18 U.S.C.] § 922(g)(3) [prohibiting gun possession by unlawful drug users] constitutional in the wake of *Bruen*") (citing cases).

Moreover, disqualifying felons from possessing firearms is analogous to civic rights that have historically been subject to forfeiture by individuals convicted of crimes. American legislatures have long denied felons the traditional rights of members of the polity. For example, Article I and the Seventeenth Amendment guarantee the "right of the people to choose" members of both Houses of Congress. *United States v.*

*Classic*, 313 U.S. 299, 314 (1941). Yet Section 2 of the Fourteenth Amendment confirms that States may deny felons the right to vote, which States have done since the founding. U.S. Const. amend. XIV, § 2; *see Richardson v. Ramirez*, 418 U.S. 24, 41-56 (1974); *Green v. Bd. of Elections*, 380 F.2d 445, 450 nn.4-5 (2d Cir. 1967) (Friendly, J.). States also have historically denied felons the right to hold public office. *Spencer v. Kemna*, 523 U.S. 1, 8-13 (1998). And felons have traditionally been disqualified from serving on juries. *See id.* at 9; 3 Blackstone 363-364. Indeed, it remains true today that committing a felony often results in "forfeit[ing] . . . a number of rights" tied to membership in the political community, including "the right to serve on a jury and the fundamental right to vote." *Medina*, 913 F.3d at 160. Legislatures may similarly deny convicted felons another traditional right of members of the polity: the right to bear arms. The Constitution would make little sense if it allowed legislatures to deny felons the right to vote, see U.S. Const. amend. XIV, § 2, yet guaranteed felons the right to possess arms so that they could help "resist tyranny," *Heller*, 554 U.S. at 598.

### C. *Range*'s Contrary Ruling Is Unpersuasive.

The Third Circuit's decision in *Range* does not support abandoning the post-*Bruen* authority upholding § 922(g)(1). In *Range*, the court issued a "narrow" ruling on an as-applied challenge to § 922(g)(1) by a defendant who, in 1995, had pleaded guilty to a Pennsylvania misdemeanor of making a false statement to obtain food stamps. 124 F.4th at 232. Because this misdemeanor was punishable by up to five years' imprisonment, it disqualified him from possessing a firearm under § 922(g)(1). *See* 18 U.S.C. § 921(a)(20)(B) (excluding only those State offenses "classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less").

*Range* conceded that the Supreme Court's consistent emphasis on "law-abiding, responsible citizens" cut against its holding, as "[i]n isolation, this language seems to support the Government's argument." *Id.* at 226. Nonetheless, contrary to *Medina* and departing from its own prior interpretations of *Heller*, *see United States v. Barton*, 633 F.3d 168, 171–72 (3d Cir. 2011), *overruled on other grounds by Binderup v. Att'y Gen. of the United States*, 836 F.3d 336 (3d Cir. 2016), the Third Circuit dismissed this language as "dicta" because "the criminal histories of the

plaintiffs in *Heller*, *McDonald*, and *Bruen* were not at issue in those cases." *Id.* at 226. As discussed above, the Supreme Court's repeated assurances about felon prohibitions are not dicta. But even if they were, courts "routinely afford substantial, if not controlling deference to dicta from the Supreme Court." *Hengle v. Treppa*, 19 F. 4th 324, 347 (4th Cir. 2021) (cleaned up). Contrary to *Range*'s approach, courts "cannot simply override a legal pronouncement endorsed . . . by a majority of the Supreme Court, particularly when the supposed dicta is recent and not enfeebled by later statements." *Id.* (cleaned up). Here, far from "enfeebling" *Heller*'s recent assurances about felons, the Supreme Court has reiterated those assurances (and thus validated the holdings of post-*Heller* cases relying upon them) at every opportunity, particularly in *McDonald*, *Bruen*, and *Rahimi*.

*Range* also complained that the Supreme Court's phrase "law-abiding" is "vague" and might be abused by legislatures to "decide whom to exclude from 'the people'" by improperly "manipulat[ing] the Second Amendment by choosing a [felony] label" for minor crimes. 123 F.4th at 217-18. But in *Bruen* itself, the Supreme Court did not view the possibility of abuse as precluding a permitting system that focused on

whether a person was law-abiding. Instead, the court emphasized, systems without a "good cause" requirement were permissible *because* "these shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding'" citizens. *Bruen*, 597 U.S. at 38 n.9. *Bruen* recognized that "any permitting scheme can be put toward abusive ends," but explained that such abuses could be addressed through constitutional challenges to the particular state action. *Id.* And although *Rahimi* clarified that a person may not be disarmed "simply because he is not 'responsible,'" 144 S. Ct. at 1903, it reiterated, rather than repudiated, *Heller*'s assurance that felons (who by definition are not law-abiding) may be disarmed. *Id.* at 1902. *Range* is out of step with *Bruen* and *Rahimi* as to the scope of the Second Amendment.

*Range* also erred in its analysis of the relevant history. *Range* "narrow[ly]" held that the government had failed to sufficiently analogize historically disarmed groups to "people like Range." 124 F.4th at 229-32. Contrary to *Rahimi* and *Medina*, the Third Circuit reasoned that although founding-era governments routinely punished non-violent

felons with the greater penalties of death and estate forfeiture, these possible penalties did not permit the government to disarm those non-violent felons. But *Range* failed to address *Medina*, which upheld § 922(g)(1) based solely on the first-step text-and-history approach that *Bruen* endorsed, and not the means-end balancing that *Bruen* disallowed. And indeed, the original *Range* en banc decision (issued after *Bruen*, but before *Rahimi*) acknowledged that *Medina* remains binding on this Court. *See* 69 F.4th 96, 106 (3d Cir. 2023) (en banc) (disregarding more than 80 post-*Bruen* district court cases upholding § 922(g)(1), because "the district courts are bound to follow their circuits' [pre-*Bruen*] precedent"). Even if it were not, the overwhelming weight of pre- and post-*Bruen* cases remain persuasive authority that § 922(g)(1) is consistent with the Nation's historical tradition of firearm regulation.

*Range*'s contrary arguments also find no support in *Rahimi*. For example, *Rahimi* undermines any argument that because the danger posed by felons has persisted since the founding, the government must identify "*distinctly* similar" analogues to § 922(g)(1), rather than only "*relevantly* similar" analogues. Like *Bruen*, *Rahimi* never suggests a more demanding "distinctly similar" test; it instead clarifies that in

evaluating a Second Amendment challenge, courts assess whether the challenged law "is 'relevantly similar' to laws that our tradition is understood to permit." *Rahimi*, 144 S. Ct. at 1898; *see also id.* at 1901. "[S]ome courts have misunderstood the methodology of [the Supreme Court's] recent Second Amendment cases" and have erroneously suggested that the Second Amendment permits only "those regulations identical to ones that could be found in 1791," *id.* at 1897—an approach similar to the one advanced in the *Rahimi* dissent. *See id.* at 1933 (Thomas, J., dissenting).

Several concurring justices expounded on this idea. Justice Barrett explained that "[t]o be consistent with historical limits, a challenged regulation need not be an updated model of a historical counterpart." *Rahimi*, 144 S. Ct. at 1925 (Barrett, J., concurring). A contrary view would result in a "'law trapped in amber'" by "forc[ing] 21st-century regulations to follow late-18th-century policy choices." *Id.* And it would wrongly "assume[] that founding-era legislatures maximally exercised their power to regulate, thereby adopting a 'use it or lose it' view of legislative authority." *Id.* Justices Sotomayor and Kagan similarly explained that, under a contrary view, "the legislatures of today would

be limited not by a distant generation's determination that [a law like § 922(g)(8)] was unconstitutional, but by a distant generation's failure to consider that such a law might be necessary." *Id.* at 1905 (Sotomayor, J., joined by Kagan, J., concurring). Indeed, even Justice Thomas's dissent repeatedly invoked the "relevantly similar" standard, *id.* at 1933, 1938, 1941, 1944 (Thomas, J., dissenting), despite explicitly concluding that § 922(g)(8) "addresses a societal problem . . . that has persisted since the 18th century," *id.* at 1941 (Thomas, J., dissenting) (cleaned up).

Thus, not a single Justice read *Bruen* as having created a two-tiered test, and for good reason. Although the existence of founding-era statutes that similarly disarmed all felons would be "a strong indicator" that § 922(g)(1) "fall[s] within a permissible category of regulations," *Rahimi*, 144 S. Ct. at 1898, the absence of one does not invalidate § 922(g)(1). *Id.* at 1901 (noting that although "Section 922(g)(8) is by no means identical" to surety and going armed laws, "it does not need to be").

Similarly, *Rahimi* forecloses any argument that capital punishment and estate forfeiture laws are not relevant because they were not firearm regulations and because they authorized different punishment than Section 922(g)(1). First, *Rahimi* confirms that in

assessing the Second Amendment's original meaning, courts are not confined to firearm regulations. Indeed, *Rahimi* relied on the historical surety tradition to sustain Section 922(g)(8), even though that tradition was not limited to "target[ing] the misuse of firearms." 144 S. Ct. at 1899–1902. *Rahimi*'s approach thus aligns with the Supreme Court's practice of consulting a "variety of legal and other sources" in assessing the Second Amendment's original meaning, *Heller*, 554 U.S. at 605, including English history, *id.* at 598-600; analogous provisions in state constitutions, *id.* at 600-03; Second Amendment precursors, *id.* at 604-05; commentary, *id.* at 605-10, 616-19; case law, *id.* at 610-14; and legislative debates, *id.* at 614-16. *See also Bruen*, 597 U.S. at 20-21; *United States v. Perez-Garcia*, 96 F.4th 1166, 1191 (9th Cir. 2024) (agreeing that "although traditional firearm regulations are an important source of historical evidence, they are not the only one"). Second, *Rahimi* expressly recognized that a historical precursor's use of different consequences to address a societal concern does not necessarily render it an inapt analogue. *See* 144 S. Ct. at 1902 (analogizing to going armed laws even though they authorized imprisonment, rather than disarmament, as punishment).

As the D.C. Circuit did in *Medina*, *Rahimi* requires courts to assess whether the government's historical analogues establish a principle that is consistent with the Second Amendment when "[t]aken together." *Rahimi*, 144 S. Ct. at 1901. The government's analogues do that here; contrary arguments faulting those analogues, or considering each in isolation, mirror those in the *Rahimi* dissent. *See id.* at 1944 (Thomas, J., dissenting) (criticizing the Court for "cobbl[ing] together" multiple historical laws rather than demanding a closer match to "a single historical law"). *Rahimi* squarely rejected the dissent's methodology, which individually dissected the government's historical analogues and dismissed them based on minute differences. 144 S. Ct. at 1902–03 (rejecting the dissent's argument that § 922(g)(8) was not sufficiently similar to historical analogues).[8] *See also Perez-Garcia*, 96 F.4th at 1191

[8] Justice Thomas's dissent provides a useful illustration of a too-demanding test. For example, he distinguished surety laws as "impos[ing] a far less onerous burden" than § 922(g)(8) because they "did not alter an individual's right to keep and bear arms" but simply acted as a "fine on certain behavior." *Rahimi*, 144 S. Ct. 1933, 1939 (Thomas, J., dissenting). He argued that "affray" (or "going armed") laws imposed a materially different burden because they were "criminal statutes that penalized past behavior, whereas § 922(g)(8) is triggered by a civil restraining order that seeks to prevent future behavior." *Id.* at 1943. He reasoned that those laws also had a different purpose than § 922(g)(8)

(continued . . . )

(rejecting a "divide-and-conquer approach to the historical evidence"). Because Section 922(g)(1) "fits comfortably within th[e] tradition" of founding-era laws and practices restricting the firearm possession of felons and individuals whose firearm possession posed a heightened risk of danger, it passes constitutional muster. *Rahimi*, 144 S. Ct. at 1897.

### D. Section 922(g)(1) Is Not Susceptible to As-Applied Challenges and Is, at the Very Least, Constitutional as Applied to Defendant.

The government maintains that § 922(g)(1) is constitutional in all of its applications and is not susceptible to as-applied challenges. At a minimum, § 922(g)(1) is constitutional as applied to defendant.

Although it is immaterial whether defendant's prior felony convictions involved violence or dangerousness, any dangerousness requirement would be satisfied here. *See also Johnson*, 158 F.4th at 210 (assuming arguendo that *Medina* left the door open to an as-applied

---

because they "captured only conduct affecting the broader public" instead of seeking to prevent "interpersonal violence in the home." *Id.* at 1942. And he argued that laws targeting "dangerous" persons "were driven by a justification distinct from that of § 922(g)(8)" because the historical laws were concerned with "quashing treason and rebellion," whereas § 922(g)(8) is "concerned with preventing interpersonal violence." *Id.* at 1934-1935.

challenge for a "sufficiently 'minor or regulatory' crime," even "nonviolent fraud convictions are not sufficiently 'minor or regulatory' to succeed on an as-applied challenge"). Specifically, Thompson has numerous convictions which prohibit him from possessing a firearm, including gun-related and violent offenses. Most relevant here, on December 15, 2010, Thompson was sentenced in DC Superior Court Case No. 2009-CF2-0003876 for carrying a pistol without a license (18 months confinement), possession of an unregistered firearm/unlawful possession of a firearm or destructive device (2 months confinement), and unlawful possession of ammunition (2 months confinement). On the same day, he was sentenced for a separate arrest which led to charges in DC Superior Court Case No. 2010-CF3-011990, and sentenced for robbery (50 months confinement) and carrying a pistol without a license (16 months).

Defendant's prior felonies convictions are violent or dangerous felonies. *See, e.g., Williams*, 113 F.4th at 662 (prior felony conviction for aggravated robbery shows defendant is dangerous); *Diaz*, 116 F.4th at 468-70 (prior felony conviction for vehicle theft justifies permanent disarmament); *United States v. Gassaway*, No. 1:21-CR-550-RCL, 2021 WL 4206616, at *3 (D.D.C. Sept. 16, 2021) ("[t]his Court agrees with

other courts in this district that unlawfully carrying a concealed or loaded firearm in public poses a risk of danger to the public") (collecting cases); *see also* D.C. Code § 23-1331(3)(A) (carrying a pistol without a license, in violation of D.C. Code § 22-4504(a)(1), and unlawful possession of a firearm by a felon, in violation of D.C. Code 22-4503, are both "dangerous crime[s]").

Accordingly, even if only felons who are violent or dangerous may be prohibited from possessing firearms, that prohibition would be constitutional as applied to defendant. The government need not demonstrate a historical tradition of disarming those convicted of the same crimes as him, or that those same crimes existed in the founding era. That demanding standard would require a "historical twin" or "dead ringer" in direct contravention of *Rahimi* and *Bruen*. See *Rahimi*, 144 S. Ct. at 1898.

## CONCLUSION

WHEREFORE, the government respectfully requests that defendant's motion be denied.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

CHRISELLEN R. KOLB
ERIC HANSFORD
Assistant United States Attorneys

/s/ *Emory V. Cole*
EMORY V. COLE
PA. Bar #49136
Assistant United States Attorney
601 D Street, NW
Washington, D.C. 20530
Emory.cole@usdoj.gov
(202) 252-7692

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have caused a copy of the foregoing to be served by electronic means, through the Court's EFS system, upon counsel for defendant, Michelle Peterson, Esq. and Isra Bhatty, Esq., email, on this 8th day of May 2026.

/s/ *Emory V. Cole*
EMORY V. COLE
Assistant United States Attorney