**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br><br>v.<br><br><br>ADRIAN THOMPSON,<br><br><br>Defendant. | Criminal Action No. 25-31 (BAH)<br><br><br>Judge Beryl A. Howell |

**MEMORANDUM OPINION**

Defendant Adrian Thompson faces a jury trial on July 20, 2026, on a one-count indictment alleging that, as a prohibited person previously convicted of a crime punishable by imprisonment for a term exceeding one year, he knowingly possessed a firearm with ammunition, on or about June 1, 2024, in Washington, D.C., in violation of 18 U.S.C. § 922(g)(1).  *See* Indictment, ECF No. 1; *see* Scheduling Order (Mar. 17, 2026).  In advance of trial, defendant filed, *inter alia*, a motion to suppress "the use as evidence at trial of all tangible objects seized from a 2019 Audi Q8 on June 1, 2024, because the search of the car was in violation of Mr. Thompson's rights under the Fourth Amendment to the United States Constitution," Def.'s Mot. to Suppress Tangible Evidence ("Def.'s Mot."), ECF No. 29, which motion the government opposes, *see* United States' Mem. in Opp'n to Def.'s Mot. ("Gov't's Opp'n"), ECF No. 35.  For the reasons explained below, defendant's suppression motion is denied.

1

I. **BACKGROUND**

The factual and procedural background relevant to resolving this pretrial motion is summarized below.

A. **Factual Background**

In opposition to defendant's pending motion to suppress, the government presented evidence at a suppression hearing held on May 28, 2026, consisting of the testimony of a Metropolitan Police Department ("MPD") officer, Sergeant Scott Possinger, who, on June 1, 2024, was assigned to the Robbery Suppression Unit ("RSU") and working the evening tour of duty in MPD's Sixth District, as well as surveillance camera footage and the body-worn camera footage of two officers at the scene.  Suppression Hearing Transcript (May 28, 2026) ("Hrg. Tr.") at 2, ECF No. 48; *id.* at 6:23-7:8 (admitting, with no defense objection, Hrg. Exhibits 1-12).

Around 11:18 p.m., two RSU members, Sergeant Scott Possinger and Investigator Wilfredo Guzman, observed from their patrol vehicle a blue Audi parked in a parking lot directly in front of 323 53rd Street, NE, Washington, D.C.  Gov't's Opp'n at 2; Hrg. Tr. at 12:3-13:1; Hrg., Gov't's Ex. 3, Surveillance Video at 0:22.  As they pulled their patrol vehicle up to the parking lot, an individual (later identified as Dion Dempsey) exited from the driver's side and another individual (later identified as defendant) exited from the front passenger's side.  Gov't's Opp'n at 2; Surveillance Video at 0:25-0:34.  Dempsey and defendant both walked away from the Audi and the patrol vehicle toward a group of people standing in the apartment courtyard abutting the parking lot.  Gov't's Opp'n at 2; Surveillance Video at 0:35.

As Dempsey and defendant walked away, the officers parked, exited their patrol vehicle, and approached the Audi.  Surveillance Video at 0:35-60.  All RSU members on the scene were dressed in plainclothes and wearing outer vests with police markings and police body worn

cameras. Gov't's Opp'n at 2. Speaking in the direction of Dempsey and defendant, Investigator Guzman asked, "Is this your car?," "Nothing in there?," and "Can I search it?," to which Dempsey responded that the vehicle cannot be searched. Hrg., Gov't's Ex. 2, MPD Investigator Wilfredo Guzman Body-Worn Camera Clip ("Guzman BWC") at 23:18:53-23:19:05. Defendant remained silent during this exchange, turning away from the officers. *Id.* at 23:18:52-23:19:03.

While this exchange was occurring, Sergeant Possinger walked to the driver's side of the Audi and shone his flashlight at the partially open window. Gov't's Opp'n at 2; Surveillance Video at 1:12. In doing so, Sergeant Possinger observed on the floor of the driver's side, partially under the driver's seat, a "large," "clear" Ziploc bag containing suspected marijuana exceeding two ounces, the legal limit for recreational marijuana consumption. Hrg. Tr. at 28:13-18, 23-25. As Sergeant Possinger explained at the suppression hearing, he observed that the marijuana was in the form of "large cannabis buds," which required additional processing to be consumed: "[I]n order to smoke [the buds], you would have to break down . . . the bud into . . . smaller leaves, break that down either with a grinder or by hand and put that inside of a marijuana cigarette . . . and then you would smoke the marijuana cigarette through some rolling paper," which is "a very common way to smoke it here in the District." *Id.* at 49:19-20, 23-24, 50:21-22, 51:7-14.

At the scene and after seeing the large Ziploc bag containing suspected marijuana, Sergeant Possinger remarked to his colleague that there was "a bunch of weed" in the Audi, and asked Dempsey to "com[e] over here" and "talk." Hrg., Gov't's Ex. 1, MPD Stg. Scott Possinger Body-Worn Camera Clip ("Possinger BWC") at 23:19:14-28. Dempsey walked back towards the car where Sergeant Possinger was standing. *Id.* at 23:19:30-38. An unidentified woman also accompanied Dempsey. *Id.* Defendant, on the other hand, did not follow Dempsey to the vehicle but rather stood with a group of people gathered nearby in the apartment courtyard. *Id.*; *see also*

Guzman BWC at 23:19:27-38.  At no point during Sergeant Possinger's investigations did defendant speak to the officers, much less voice any interest in the vehicle or its contents to the officers.

Sergeant Possinger told Dempsey that because there was "more than 2 ounces of marijuana . . . [u]nder the seat," he was "going to search [the] vehicle."  Possinger BWC at 23:19:36-46.  Dempsey protested the search, and Sergeant Possinger heard Dempsey say, "No, I ain't got no weapons" in there.  *Id.* at 23:19:44-46; Hrg. Tr. at 84:6-8.  Dempsey also told Sergeant Possinger that his aunt was the registered owner of the vehicle, walking away from Sergeant Possinger to "get her."  *Id.* at 23:20:00-05.  Later investigation revealed that Dempsey was the registered owner of the vehicle.  Gov't's Opp'n at 7; *see also* Hrg., Gov't's Ex. 11.  As Sergeant Possinger opened the vehicle door to begin his search of the interior, he observed Dempsey "running" away.  Possinger BWC at 23:20:20.  Dempsey was subsequently arrested.  A search of the interior revealed a digital scale under the driver's seat with the marijuana, and a firearm in the glove box compartment.  Hrg. Tr. at 46:15-47:23 (Sergeant Possinger discussing Hrg., Gov't's Exs. 4 & 5).

Upon Sergeant Possinger's discovery of the firearm on the passenger side, Investigator Guzman arrested defendant as well.  When Investigator Guzman explained to defendant that he was arrested because he was in the passenger side of the car where the gun was found, defendant protested, "No, I wasn't.  I wasn't in the car."  Guzman BWC at 23:21:55-58.

The marijuana was later field tested and weighed approximately 6.17 ounces.  Gov't's Opp'n at 6.  A field test of the digital scale returned a positive indication for the presence of Tetrahydrocannabinol, the psychoactive ingredient in cannabis.  *Id.* at 9.  The firearm was identified as a Glock model 30S .45 caliber, had an obliterated serial number, and was loaded.  *Id.*

at 8. Swabs from the firearm and magazine were further submitted for DNA testing. The DNA from the firearm yielded a mixture of five or more individuals and was not suitable for comparison, but the DNA results from the magazine were interpreted as originating from four individuals and are 130 trillion times more likely if defendant Thompson and three unknown, unrelated people were contributors than if four unknown, unrelated people were contributors. *Id.* at 9. Dempsey was excluded as a contributor. *Id.*

### B.      Procedural History

On January 28, 2025, defendant was charged by indictment with the crime of felon-in-possession, under 18 U.S.C. § 922(g)(1). Indictment, ECF No. 1. At the Court's direction, *see* Min. Order (Sept. 4, 2025), the parties initially proposed alternative dates for trial, with the government proposing a trial in this matter between October and December 2025, while defendant, due to defense counsel's congested trial schedule, requested dates no earlier than March 2026, *see* parties' Joint Response, ECF No. 20, prompting the entry of a Scheduling Order, with the jury trial scheduled for April 20, 2026, *see* Scheduling Order (Sept. 12, 2025). The government subsequently objected to defendant's request, several months later, to postpone the trial date from April 20, 2026, to August 2026, or later, *see* Def.'s Mot. Continue Trial, ECF No. 22, and defendant's request for a continuance was denied, Min. Order (Jan. 28, 2026). Nevertheless, in March 2026, the parties jointly agreed to a new trial date and pre-trial schedule given that one of defendant's counsel had left the Federal Public Defender's Office and the second of defendant's counsel was on extended medical leave, *see* Def.'s Unopposed Mot. to Continue Trial, ECF No.

31, and the parties' proposed schedule was adopted in full, setting the new trial date for July 20, 2026, *see* Scheduling Order (Mar. 17, 2026).[1]

In advance of trial, defendant timely filed a motion to suppress "all tangible objects seized from a 2019 Audi Q8 on June 1, 2024, because the search of the car was in violation of Mr. Thompson's rights under the Fourth Amendment to the United States Constitution." Def.'s Mot. at 1.[2] After the completion of briefing, *see* Gov't's Opp'n; Def.'s Reply in Supp. of Mot., ECF No. 39, and denial of the government's motion to deny the suppression motion without a hearing, *see* Min. Order (May 20, 2026) (denying government's Supplemental Opposition and Request that the Defendant's Motion to Suppress be Denied Without a Hearing, ECF No. 40, "given the clear factual disputes between the parties necessitating a hearing"), an approximately three-hour hearing on the suppression motion was held on May 28, 2026. The government introduced one witness, Sergeant Possinger, who testified to the events that resulted in the search of the Audi and defendant's arrest. Defendant introduced three witnesses: (1) Dempsey, who, with the advice of his counsel, promptly asserted his rights under the Fifth Amendment and declined to answer questions; (2) defense investigator Tyrees Smith, who testified to what Dempsey told him about defendant's connection with Dempsey's vehicle; and (3) defendant himself, who also testified to his connection with Dempsey's vehicle, until he, too, asserted his Fifth Amendment right against self-incrimination.

---

[1]     The government has recently filed a motion to continue the trial date from July 20, 2026, for "at least 90 days," Gov't's Opposed Mot. to Continue Trial at 1, ECF No. 51, which motion defendant vigorously opposes, Def.'s Opp'n to Gov't's Opposed Mot. to Continue Trial, ECF No. 59.

[2]     Defendant also moved to dismiss the indictment charging him with unlawful possession of a firearm and ammunition by a person convicted of a crime punishable by imprisonment for a term exceeding one year, under 18 U.S.C. § 922(g)(1), on the ground that this statute "violates the Second Amendment to the U.S. Constitution," Def.'s Mot. to Dismiss at 1, ECF No. 28, which motion was denied, *see* Min. Order (May 19, 2026). The government filed no pretrial motions by the deadline set in the Scheduling Order.

Following the hearing and at the request of the parties, *see* Hrg. Tr. at 153:16-24, 154:16-21, the parties were permitted to submit supplemental briefing on defendant's standing to challenge the search under the Fourth Amendment, the merits of the Fourth Amendment challenge, and the admissibility and strength of the defendant's investigator's testimony and defendant's own testimony following his invocation of the Fifth Amendment.  With supplemental briefing complete on July 1, 2026, defendant's motion is now ripe for review.  *See* Def.'s Supp. Br. in Supp. Mot. to Suppress ("Def.'s Supp. Br."), ECF No. 47; Gov't's Supp. Opp'n After Mot. to Suppress Hrg. ("Gov't's Supp. Opp'n"), ECF No. 50; Def.'s Supp. Reply Br. in Supp. Mot. to Suppress, ECF No. 57.

## II.    LEGAL STANDARD

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  "[S]earches and seizures conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993) (internal quotation marks omitted).  "If the government oversteps that constitutional boundary, the remedy is generally exclusion—courts must suppress the unlawfully obtained evidence and any derivative evidence tainted by the violation unless an exception applies." *United States v. Green*, 149 F.4th 733, 743 (D.C. Cir. 2025).  Typically, "[t]he proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978).  "[W]hen a search or seizure is warrantless," however, as is the case here, "the government carries the burden of justifying the agent's actions." *United States*

*v. Singleton*, 759 F.2d 176, 181 (D.C. Cir. 1985); *see also United States v. Jeffers*, 342 U.S. 48, 51 (1951) ("[T]he burden is on those seeking the exemption to show the need for it[.]").

## III.    DISCUSSION

Defendant asserts that Sergeant Possinger lacked probable cause to search the interior of the vehicle, arguing that he impermissibly breached the interior of the Audi before discovering the bag of marijuana, Def.'s Mot. at 7-11, and, in the alterative, that the "small quantity of marijuana" in the car did not justify the search, *id.* at 11-14.  The government in turn argues that, as an initial matter, defendant lacks standing to challenge the search because he "cannot establish that he had any expectation of privacy in the vehicle searched."  Gov't's Opp'n at 10-13.  The government further contends, in response to defendant's arguments about the legality of the search, that the marijuana was in plain view, Gov't's Opp'n at 13-16, and that probable cause existed for the search, *id.* at 16-19.  As the government's arguments are persuasive across the board, defendant's motion to suppress is denied.

### A.    FOURTH AMENDMENT STANDING

Under the principle of "Fourth Amendment standing," a criminal defendant seeking suppression must show that "his *own* Fourth Amendment rights [were] infringed by the search and seizure which he seeks to challenge."  *Terrence Byrd v. United States*, 584 U.S. 395, 403 (2018) (emphasis added) (citation omitted).  Not to be confused with Article III standing, Fourth Amendment standing "is not a jurisdictional question."  *Id.* at 411.  Rather, "[t]he concept of standing in Fourth Amendment cases" is "a useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search."  *Id.* at 410-11; *see also Minnesota v. Carter*, 525 U.S. 83, 92 (1998) (Scalia, J., concurring) ("The obvious meaning of the [Fourth Amendment] is that *each* person has

the right to be secure . . . in *his own* person, house, papers, and effects." (emphases in original));

*United States v. Beaudion*, 979 F.3d 1092, 1097 (5th Cir. 2020) ("[A] defendant seeking to

suppress evidence must show not only that the police committed an unreasonable search or seizure,

but also that the search or seizure 'infringed [a Fourth Amendment] interest of the defendant'

himself."  (second alteration in original) (quoting *Rakas*, 439 U.S. at 140)).

To "claim the protection of the Fourth Amendment," the person asserting the right must

show that he "has a legitimate expectation of privacy in the invaded place."  *Rakas*, 439 U.S. at

143.  Although there is no "single metric or exhaustive list of considerations," a defendant's

expectation of privacy must be grounded in either "concepts of real or personal property law" or

"understandings that are recognized and permitted by society."  *Byrd*, 584 U.S. at 405.  Critically,

while passengers in vehicles may, in certain situations, "have an expectation of privacy in

automobiles," "legitimate presence alone" is insufficient.  *Id.* at 406.  Rather, one must "exhibit a

legitimate expectation of privacy in the car *at the time of the search*."  *United States v. Rogers*, 97

F.4th 1038, 1041-42 (6th Cir. 2024) (emphasis added) (internal quotation marks omitted); *see also*

*United States v. Gibson,* 708 F.3d 1256, 1277 (11th Cir. 2013) ("We have held that an individual

who borrows a vehicle with the owner's consent has a legitimate expectation of privacy in the

vehicle and standing to challenge its search *while it is in his possession*." (emphasis added)).

Defendant failed to establish his standing to challenge the search under the Fourth

Amendment.  At no point did defendant demonstrate that, *at the time of the search*, he had "lawful

possession and control" of the vehicle or the "right to exclude" others from it.  *Byrd*, 584 U.S. at

407.  The parties do not dispute that defendant is not the registered owner of the vehicle, nor was

he in the driver's seat controlling the vehicle when the officers arrived at the scene.  *See* Gov't's

Ex. 3, Surveillance Video at 00:21-34 (showing defendant exiting from the passenger seat).

Defendant also at no point asserted any privacy interest in the car during the officers' investigations at the scene. When the officers approached, defendant walked away from the vehicle toward the courtyard of an abutting apartment complex. *Id.* at 00:35-40. When officers asked whose car it was and whether it could be searched, defendant remained silent and deferred to the vehicle's owner, Dempsey. Guzman BWC 23:18:57-23:19:07. When officers followed up with questions about the vehicle's contents, defendant turned *away* from the vehicle and the officers, joining the group of people in the apartment courtyard and leaving Dempsey to answer the officers' questions and protest the search. Guzman BWC 23:19:27-23:19:40. Defendant's actions reveal that even defendant himself viewed Dempsey as the person in control of and responsible for the car at the time of the search. In fact, when officers moved to arrest defendant, explaining that the arrest was because defendant was in the passenger side where the gun was found, defendant denied any connection with the vehicle, adamantly protesting, "No, I wasn't. I wasn't in the car." Guzman BWC at 23:21:55-58. *Cf. United States v. Lawson*, No. 21-13272, 2022 WL 15180299, at *5 (11th Cir. Oct. 27, 2022) ("[Defendant] abandoned any interest in the Nissan and key when he repeatedly disclaimed ownership of the key and voluntarily walked away from the Nissan and the key."). Defendant thus has fallen short of establishing a legitimate expectation of privacy in the vehicle at the time of the search.

Defendant's testimony at the suppression hearing, Hrg. Tr. at 134:4-153:11, and the declaration of Dempsey, Def.'s Ex. 6, Declaration of Dion Dempsey ("Dempsey Decl."), do not change the conclusion for two reasons.[3]

---

[3] The government argues that defendant's testimony should be struck based on his invocation of the Fifth Amendment. This issue need not be reached as, even assuming defendant's testimony may be considered, defendant's testimony is found unpersuasive.

First, the trustworthiness of this testimonial evidence is doubtful. As the body-worn camera footage shows, both defendant and Dempsey appear to have already made untruthful statements to law enforcement about their connection with the vehicle and the contents inside. Defendant appears to have falsely represented to Investigator Guzman, twice, that he was not in the car, despite surveillance video evidence to the contrary. *See* Guzman BWC at 23:21:55-58 (defendant protesting, when Investigator Guzman arrested defendant for being in the passenger side of the car where the gun was found, "No, I wasn't. I wasn't in the car"); Hrg. Tr. at 138:20-23 (defendant, when cross-examined with this video footage of him denying his presence in the vehicle, admitting, "Yeah, it was a lie"). Dempsey, similarly, appears to have made false statements to law enforcement on the night in question, first denying any contraband was in the vehicle, when in fact a Ziploc bag of marijuana and a firearm with an obliterated serial number were recovered, and then asserting that his aunt was the registered owner of the vehicle, when later investigation revealed that Dempsey was the registered owner. Possinger BWC at 23:19:44-23:20:05; *see* Gov't's Exs. 4, 7, 11.

Second, both defendant and Dempsey also have incentives to continue making untruthful statements, as both were seen in the vehicle with the contraband and have an interest in protecting themselves and each other. In fact, when defendant attempted to call Dempsey as a witness, Dempsey asserted his Fifth Amendment right, preventing the government from testing Dempsey's credibility on the stand. Hrg. Tr. at 108:11-109:9. Dempsey's refusal to testify under oath and be cross-examined was the reason defense counsel resorted to introducing, over the government's objection, Dempsey's affidavit into evidence instead, a fact that also raises questions about the truthfulness of Dempsey's affidavit. Hrg. Tr. 109:8, 10-11 (defense counsel stating, "I think [Dempsey] has a Fifth. . . . The defense at this point moves in Defendant's Exhibit 6, which is an

11

affidavit [from Dempsey].'"); *id*. at 113:20-23 (overruling government's objection and admitting Dempsey affidavit).

Defendant's own testimony, in turn, contained self-serving representations. *See, e.g.*, Hrg. Tr. 141:17-19, 143:4-11, 144:8-145:4, 145:11-14, 150:11-15 (defendant asserting that, at different times on the day of the incident, he had been a driver and a passenger of the vehicle, which are facts that relate to his Fourth Amendment standing, but also claiming no knowledge of the Ziploc bag of marijuana on the driver side's floor or the firearm in the passenger glove compartment). Upon further cross-examination by the government, defendant ultimately also invoked his Fifth Amendment rights. Hrg. Tr. 146:7 (defendant stating: "I plead the Fifth.").[4]

In any event, even if the facts asserted by defendant and Dempsey were taken as true, they do not help defendant and largely support the government's position. Defendant's proffered evidence corroborates that, at the time of the search, defendant was a passenger, and that Dempsey controlled the vehicle. Hrg. Tr. 138:20-23 (defendant admitting on cross-examination that he was a passenger in the car when the officers arrived); Surveillance Video at 00:23-26 (showing Dempsey exiting from the driver's side); Dempsey Decl. ¶ 16 (Dempsey's affidavit confirming that Dempsey drove to the apartment complex—the scene of the encounter with the officers—"to see his sister, who was pregnant"). Defendant's own testimony also indicated that he did not otherwise have joint control over the vehicle or an independent right to use it. Defendant testified that he did not pay for the purchase of vehicle, and agreed that it was "totally Mr. Dempsey's car." Hrg. Tr. 152:24-25, 153:1-2. Defendant also testified that he did not have his own set of keys, *id.*

---

[4] Defendant also introduced defense investigator Tyrees Smith as another witness. Smith attests that he spoke with Dempsey prior to the creation of Dempsey's affidavit. Smith's testimony, however, added no new information beyond that already contained in Dempsey's affidavit, and thus Smith's testimony adds little to the standing analysis. Hrg. Tr. 121:2-7 (defense investigator responding to Court's question, "Did your conversation with Mr. Dempsey go beyond the statements that are contained within the affidavit?," with, "From the best of my recollection of the affidavit, no," and the Court's question "Does the affidavit capture essentially the gist of what Mr. Dempsey told you?," with "Yes, absolutely.").

136:15-16, and needed to ask Dempsey for permission and for the keys each time he wished to borrow the vehicle, *id.* 151:21-152:1. Defendant acknowledged he would need to "let Dempsey know how long [he] would have the car," *id.* 152:2-4, and could be directed by Dempsey to return the vehicle when Dempsey required it, *id.* 152:12-20. The fact that defendant "often" borrowed Dempsey's car, Dempsey Decl. ¶ 4, "would sometimes fill the gas," *id.* ¶ 8, would "sometimes pick up other passengers," *id.* ¶ 10, or kept "some personal belongings" in there, *id.* ¶ 12, does not outweigh the countervailing evidence establishing that defendant did not control the vehicle at the time of the search. Indeed, Dempsey and defendant both admit that defendant's connection to Dempsey's car and his ability to use it with Dempsey's permission was not special, as Dempsey "frequently" loaned the car to others too "because it was a nice car." *Id.* ¶ 6; *see also* Hrg. Tr. 135:21-22 (defendant answering "Yes" to the question, "[W]ere you aware of whether people other than you and Mr. Dempsey also drove the vehicle?").

As other circuits have found when faced with similar facts about a defendant's control, or lack thereof, over a searched vehicle, prior use of another's car does not guarantee Fourth Amendment standing when the defendant was merely a passenger at the time of the search and lacked power to control the vehicle or exclude others from it. In *United States v. Dixon*, for example, the Eleventh Circuit held that although the defendant in that case had "permission" to use his girlfriend's car "any time he wanted," "had the spare key to the car," "left personal belongings in the car, paid to repair the car, and sometimes purchased gas," the defendant nevertheless lacked standing to challenge a particular search during which his girlfriend was the driver and the defendant was in the front passenger seat. The court reasoned that the defendant "had no legal interest in the vehicle and, at the time of the search, was a passenger with no power to control the vehicle or exclude others from it." 901 F.3d 1322, 1339 (11th Cir. 2018). "That

[the defendant] may have used the car on other occasions, even frequently, does not give him a durable interest in the car equivalent to that of the legal owner and driver," "when the legal owner was driving it and he was a mere passenger" without "'exclusive custody and control' of the car." *Id.* at 1339 (quoting *Gibson*, 708 F.3d at 1278).

Similarly, in *United States v. Rogers*, the Sixth Circuit held that although the defendant had established that he had driven his girlfriend's car alone before and had "permission" to use his girlfriend's car, the defendant nevertheless lacked Fourth Amendment standing at the time of the search because, at the time of the search, he was merely "sitting in the passenger seat, ostensibly waiting for his girlfriend to return from a quick trip into a neighbor's house up the street." 97 F.4th at 1042-43. The Sixth Circuit reasoned that the defendant "never exhibited a subjective expectation of privacy," as he "was neither owner nor driver of the vehicle," and "affirmatively *disclaimed* dominion and control over the car" by "ma[king] it clear to the officers on the scene multiple times that he was not the driver." *Id.* (emphasis added); *see also United States v. Green*, No. 23-12377, 2025 WL 3159132, at *6-7 (11th Cir. Nov. 12, 2025) (holding that the defendant lacked Fourth Amendment standing to challenge the search of a Ford vehicle driven by another person, because even though the defendant "had driven the car on prior occasions" and "his luggage was in the car," the defendant "did not own the car" and "was not present in the vehicle when it was searched" but rather only nearby).

The facts here compel a similar finding. Although defendant argues that he has in the past obtained permission to use Dempsey's vehicle, leaves personal belongings in it, and sometimes purchased gas for or picked up passengers in, the car, *see* Def.'s Supp. Br. 13-16, defendant nevertheless lacks standing to challenge the search at issue because, at the time of the search, he "had no legal interest in the vehicle" and "was a passenger with no power to control the vehicle or

14

exclude others from it." *Dixon*, 901 F.3d at 1339.  Defendant did not pay for the vehicle, did not own or even possess his own set of keys, did not have authority to use the vehicle without asking for permission, and at the time in question was a mere passenger in a vehicle driven by Dempsey. Defendant's assertion that the vehicle was "effectively joint property," Def.'s Supp. Br. at 13, is not supported by Dempsey's affidavit, which made no such representation that Dempsey considered his car to be jointly owned by defendant simply because defendant "often" borrows it. *See generally* Dempsey Decl.; *id.* ¶ 6 (Dempsey revealing that "other people" would "frequently borrow" his car too).

Moreover, at no point before or during the search did defendant assert an interest in the vehicle or the property seized when officers inquired about them.  *See Rakas*, 439 U.S. at 148 ("[P]etitioners' claims must fail. They asserted neither a property nor a possessory interest in the automobile, nor an interest in the property seized.").  To the contrary, defendant "affirmatively disclaimed" any connection with the vehicle when officers moved to arrest him, *Rogers*, 97 F.4th at 1043, arguing with the officers that he "wasn't in the car," Guzman BWC at 23:21:55-58; *see also United States v. Hastamorir*, 881 F.2d 1551, 1559 (11th Cir. 1989) (holding that the defendant "effectively abandoned any fourth amendment rights he possessed in the [vehicle] and its contents" when he "repeatedly disclaimed any knowledge of or interest in the vehicle and the boxes").

Defendant points to the Supreme Court's decision in *Byrd*, *see* Def.'s Reply at 3 (discussing *Byrd*); Def.'s Supp. Reply at 4-6 (same), but that case is not dispositive.  In *Byrd*, the defendant was "the driver and sole occupant" of the rental car at the time of the car's search, and the Court noted the "expectation of privacy that comes from lawful possession and control" and recognized, as a general rule, a driver's Fourth Amendment privacy interest when borrowing someone else's rental car. *Byrd*, 584 U.S. at 406-07.  Defendant's situation as a mere passenger with the owner in

15

the driver's seat is meaningfully different, and as discussed above, defendant has presented no evidence that he otherwise had control over or rights to the vehicle at the time of the search such that he would have a legitimate expectation of privacy in the vehicle. Defendant's broad understanding of *Byrd* to mean that "those who regularly share and store items in a car with their family members, romantic partners, roommates, or close friends, naturally have a protected expectation of privacy in the car's contents," Def.'s Supp. Br. at 6, has been rejected by other circuits in cases decided after *Byrd*. *See. e.g.*, *Dixon*, 901 F.3d at 1339 (finding the defendant lacked Fourth Amendment standing to challenge a search where "the legal owner [his girlfriend] was driving it and he was a mere passenger," despite the defendant's prior uses of his girlfriend's vehicle); *Rogers*, 97 F.4th at 1043 (similar).

Defendant's other cited cases finding Fourth Amendment standing for passengers are also distinguishable: Put simply, none of the cases relied upon by defendant involve a situation where the defendant was the mere passenger of a vehicle *driven by and in the exclusive control of the vehicle's legal owner*, much less one where the defendant-passenger failed to assert any interest in the vehicle to the officers and disclaimed any connection with the vehicle when confronted. *See* Def.'s Supp. Br. at 7-13.[5] Most of defendant's cited cases on this point involve a defendant-passenger who borrowed a vehicle from the vehicle's legal owner, had possession of the vehicle at the time of the search, and gave *another person who was not the owner* permission to drive the car without the owner present at the scene. In those situations, many courts have found that the borrower of the car, even if just a passenger, maintained control over the vehicle at the time of the

---

[5]    Def.'s Supp. Br. at 7-13 (citing *United States v. Rose*, 731 F.2d 1337 (8th Cir. 1984); *United States v. Martinez*, 808 F.2d 1050 (5th Cir. 1987); *United States v. Walton*, 763 F.3d 655 (7th Cir. 2014); *United States v. Griffin*, 729 F.2d 475 (7th Cir. 1984); *United States v. Lindsey*, 691 F. Supp. 3d 1370 (M.D. Fla. 2023), *aff'd.*, No. 24-13953, 2026 WL 1819094 (11th Cir. Jun. 24, 2026); *United States v. Montalvo-Flores*, 81 F.4th 339 (3d Cir. 2023); *United States v. Allmon*, No. 5:21-cr-121, 2023 WL 3743872 (E.D. Tex. May 15, 2023), *report and recommendation adopted*, No. 5:21-cr-121, 2023 WL 3739074 (E.D. Tex. May 31, 2023); *United States v. Turner*, No. 13-40050-01-JAR, 2013 U.S. Dist. LEXIS 151380 (D. Kan. Oct. 21, 2013)).

search. *See Rose*, 731 F.2d at 1343 (defendant-passenger borrowed his sister's car, had "keys to both the ignition and the trunk," and "had given [his co-conspirator] permission to drive" without his sister present); *Martinez*, 808 F.2d at 1056 (defendant-passenger borrowed her boyfriend's car and gave her co-conspirator permission to drive without her boyfriend present); *Griffin*, 729 F.2d at 483 n.11 (passenger-defendant borrowed a car from his brother, who was not in the vehicle at the time of the search); *Allmon*, 2023 WL 3743872, at *10 (defendant-passenger was in a car with two others, none of whom owned the car, and the defendant was determined to be the "lawful possessor of the vehicle as evidenced by the phone calls with the owner attempting to locate valid insurance"). In contrast, here, the vehicle was squarely within the control of the vehicle's legal owner, who was not only seen in the driver's seat but who also stepped forward to answer the officers' questions about the vehicle. Defendant's other cited cases are similarly factually inapposite. *See Walton*, 763 F.3d at 666 (defendant rented the car and was the authorized driver); *Lindsey*, 691 F. Supp. 3d at 1378 (defendant was the driver); *Montalvo-Flores*, 81 F.4th at 340-41, 343 (defendant borrowed his girlfriend's rental car and possessed the keys at the time of the search); *Turner*, 2013 U.S. Dist. LEXIS 151380, at *21 (defendant's girlfriend expressly testified that "they treated the vehicle as joint property").

Accordingly, because defendant has not established a legitimate expectation of privacy in Dempsey's vehicle at the time of the search, defendant's motion to suppress is denied for lack of Fourth Amendment standing.

### B.    PROBABLE CAUSE

In any event, even if defendant had a cognizable Fourth Amendment interest in Dempsey's car, the officers were entitled to search the car without a warrant under the automobile exception.

17

The "automobile exception" allows officers to search a vehicle without a warrant if "a car is readily mobile and probable cause exists to believe it contains contraband." *United States v. Maynard*, 615 F.3d 544, 567 (D.C. Cir. 2010) (internal quotation marks omitted). Given "[t]he inherent mobility of the car, combined with the lesser expectation of privacy in an automobile as compared to a home or office," *United States v. Young*, 371 F. App'x 358, 361 (4th Cir. 2010), a car is considered "'readily mobile' even when parked," *United States v. Moore*, No. 18-cr-198, 2021 WL 1966570, at *2 (D.D.C. May 17, 2021). *See also Mack v. City of Abilene*, 461 F.3d 547, 553 n.2 (5th Cir. 2006) ("The automobile exception applies where a car is parked in an apartment complex parking lot." (internal quotation marks and alteration omitted)); *United States v. Brookins*, 345 F.3d 231, 237-38 & n.8 (4th Cir. 2003) (similar). As to probable cause, the analysis requires consideration of "the totality of the circumstances and the facts known to the officers at the time of the search." *United States v. Jackson*, 415 F.3d 88, 91 (D.C. Cir. 2005). Of the many factors that may prove relevant, "the discovery of contraband" weighs "strongly" in favor of finding probable cause. *United States v. Brown*, 334 F.3d 1161, 1173 (D.C. Cir. 2003). If probable cause is established, officers are "justifie[d] [in] search[ing] . . . every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825 (1982).

Probable cause supported the officers' warrantless search of the vehicle based on evidence of illegal drugs in the vehicle, and the vehicle owner's spontaneous mention of weapons. As Sergeant Possinger testified, he observed a clear plastic bag of marijuana that appeared to be more than two ounces, the legal limit for recreational consumption, *see* D.C. Code § 48-904.01(a)(1)(A), "resting on the driver's floorboard partially under the driver's seat but still exposed on the driver floorboard itself." Hrg. Tr. 28:13-25; *Jackson*, 415 F.3d at 99 (Edwards, J., concurring) (noting the "unremarkable proposition that finding drugs . . . in the passenger compartment of a car gives

18

rise to probable cause to search [other parts of the car] for additional contraband" (citing *Brown*, 334 F.3d 1161; *United States v. Turner*, 119 F.3d 18 (D.C. Cir. 1997))).   Sergeant Possinger assessed that the amount of marijuana he saw "for one individual or two individuals inside of a vehicle . . . would be a large[] amount just for personal possession," Hrg. Tr. at 18:21-22, and he further observed that the marijuana was in the form of "large cannabis buds," *id.* at 49:19, which based on his training and professional experience, could not be consumed without additional processing and amplified the likelihood that the marijuana was intended for distribution rather than personal consumption.  *Id.* at 49:23-25 (Sergeant Possinger explaining that the "larger marijuana buds" had not "been grinded down like you would grind it to put in a marijuana cigarette").  Sergeant Possinger also testified that in his experience, medical marijuana, which has a higher legal limit of 8 ounces, *see* D.C. Code § 7-1671.03, would not be sold in Ziploc bags.  Hrg. Tr. 100:7-8 (Sergeant Possinger testifying that, "[f]rom my experience, at dispensaries, marijuana would not be sold from a dispensary in a [Z]iploc bag"); *see also United States v. Watson*, 697 A.2d 36, 38 (D.C. 1997) (holding that finding drugs in a car gave probable cause for a trunk search, particularly because some of the drugs were packaged in "a bundle of six [Z]iploc bags" "supporting an inference that [the defendant] was dealing" the drugs).

Finally, Sergeant Possinger testified that when Dempsey was informed that a search of the car was necessary because there was "more than two ounces of marijuana in there," Possinger BWC at 23:19:37-44, Dempsey responded, "No, I ain't got no weapons . . . in there," *id.* at 23:19:44-46.[6]   As Sergeant Possinger explained, this sudden mention of "weapons," in a

---

[6]   Dempsey's exact words after the statement, "I ain't got no . . .," are muffled and difficult to hear on the body-worn camera footage, but based on the Court's review, one possible interpretation is that he said, "I ain't got no weapons or marijuana in there."  Possinger BWC at 23:19:44-46.  Notably, defense counsel re-played that part of the footage twice during cross-examination, Hrg. Tr. 83:8-84-8, and after having Sergeant Possinger point out the exact moment where he believed Dempsey mentioned "weapons," defense counsel decided not to challenge Sergeant Possinger's interpretation.  *Id.* 84:9-10, 18-19 (defense counsel cross-examining Sergeant Possinger only on whether "weapons" could have meant something besides a firearm, stating "Weapons, though, he doesn't say anything about

conversation that had only concerned marijuana up until that point, suggested to him that there might also be a weapon in the vehicle. These facts established a "fair probability" that the car contained contraband justifying a search of any area within the car that could conceal illegal drugs. *See Ross*, 456 U.S. at 821 ("When a legitimate search is under way . . . nice distinctions . . . between glove compartments, upholstered seats, trunks, and wrapped packages, in the case of a vehicle, must give way to the interest in the prompt and efficient completion of the task at hand.").[7]

Defendant's principal argument is that when Sergeant Possinger first investigated the car through the partially open window, Sergeant Possinger's "hand, hat, and part of his nose, along with his flashlight, entered the Audi" and impermissibly breached the car before Sergeant Possinger saw the marijuana on the driver's side. Def.'s Mot. at 6; Def.'s Supp. Br. at 16-18. This assertion does not appear to be factually supported. *See* Gov't's Opp'n at 18. Defendant's main evidence is a zoomed-in screenshot from a surveillance video. *See* Def.'s Mot. at 4 (depicting photo from Surveillance Video at 1:11-12). That photo, however, at best shows Sergeant Possinger's "hand, flashlight, hat, and nose" near the plane of the car, but from the angle shown, no part of him is clearly "inside" the vehicle as defendant argues. Def.'s Mot. at 6. Indeed, Investigator Guzman's body-worn camera, which provides another angle and a closer view of Sergeant Possinger, shows Sergeant Possinger carefully keeping himself and his flashlight outside

---

a gun? . . . The term weapon is more expansive than gun, correct?"); *but see* Def.'s Supp. Br. (later arguing in supplemental briefing that "[n]o such language is audible on the body-camera footage"); Def.'s Supp. Reply at 3 & n.1 (same). The Court finds Sergeant Possinger's testimony as to what defendant said to be credible. *See also* Hrg. Tr. 95:20-96:25 (government counsel, on redirect examination, again replaying the body-worn camera footage and asking Sergeant Possinger to pinpoint the exact moment he heard Dempsey say "I ain't got no weapons").

[7] Sergeant Possinger also testifies that Dempsey took flight "unprovoked." Hrg. Tr. 36:23. Since Dempsey began running *after* Sergeant Possinger opened the vehicle door and began the search, however, Dempsey's flight from the officers was not a "fact[] known to the officers at the time of the search." *Jackson*, 415 F.3d at 91. Dempsey's "unprovoked" flight is therefore not considered in the probable cause analysis.

20

of the car.  Guzman BWC at 23:19:10-17.[8]  Defendant also argues that Sergeant Possinger could not have seen the marijuana "under the seat," as Sergeant Possinger stated on the body-worn camera footage, without leaning into the vehicle.  Def.'s Supp. Br. at 17 (citing Possinger BWC at 23:19:15-45); *see also* Def.'s Supp. Reply at 16-17.  Yet, Sergeant Possinger's explanation on the stand that the Ziploc bag of marijuana was "partially under" the seat with "over half of it stuck out from underneath the seat" and could be "clearly see[n] . . . from the window," Hrg. Tr. at 32:24-33:2, was credible and does not "def[y] common sense," as defendant argues, Def.'s Supp. at 21.  Defendant's argument that Sergeant Possinger's "hand, hat, and part of his nose, along with his flashlight, entered the Audi" thus fails to persuade.

Finally, defendant's remaining arguments about the strength of the evidence supporting probable cause also fall short.  Defendant's argument that the marijuana in the vehicle was only a "small quantity" and "appears to be packaged for personal use," Def.'s Mot. at 11, or "for medicinal purposes," Def.'s Reply at 10, is contradicted by Sergeant Possinger's persuasive testimonial evidence that the marijuana weighed more than the legal limit for recreational consumption of two ounces, that marijuana in "large . . . bud" form requires additional refinement in order to be consumed, and that medical marijuana is unlikely to be sold in a Ziploc bag.  Hrg. Tr. at 18:19-24, 51:5-15, 100:7-8.  Defendant's further argument, citing to *United States v. Freeman*, that there was "no smell" to "suggest[] the marijuana was being actively consumed or distributed" also misses the mark.  Def.'s Mot. at 11 (citing Def.'s Ex. A, Suppression Transcript at 39, *United States v. Freeman* (BAH), No. 25-127 (D.D.C. 2025) ("*Freeman* Suppression Tr.")));

---

[8]     Since Investigator Guzman was also conducting his own investigations at the time and moving around, his body-worn camera does not show Sergeant Possinger at the exact moment from defendant's screenshot of the surveillance video, but it does show moments right before and right after.  *See* Guzman BWC at 23:19:10-17. Defendant has not contended that any of the close-up footage from Investigator Guzman's body-worn camera show Sergeant Possinger breaching the interior of the car.

*see also* Def.'s Supp. at 24.  In *Freeman*, the Court found the lack of evidence "that the defendant smelled of alcohol or appeared to be intoxicated" notable, when viewed together with the lack of other evidence suggesting unlawful behavior.  *See Freeman* Suppression Tr. at 33:4-10 (noting also the lack of evidence that "defendant was engaged in any nervous, furtive, or evasive behavior, and observing that the "defendant was not seen with any contraband or weapons").  Here, unlike in *Freeman*, the lack of marijuana smell carries less weight because sufficient other evidence supported the finding of probable cause for the search.

Defendant's motion to suppress the evidence is thus denied on the alternative ground that probable cause existed to search the vehicle.

## IV.    CONCLUSION

For the reasons above, defendant's Motion to Suppress Tangible Evidence, ECF No. 29, is DENIED.    An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  July 3, 2026

                                                        _____
                                                        **BERYL A. HOWELL**
                                                        United States District Judge