**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>ADRIAN THOMPSON,<br>Defendant. | Criminal Action No. 25-31 (BAH)<br>Judge Beryl A. Howell |

# MEMORANDUM OPINION

The government's pending motion to dismiss without prejudice the indictment against defendant Adrian Thompson amounts to nothing more than a strategic attempt to circumvent the Speedy Trial Act in circumstances where noncompliance with this statute was inevitable and due entirely to the government's own mismanagement of this case. After defendant was first arrested in 2024 and brought to the District of Columbia Superior Court, the charge against him was "no-papered," or declined for prosecution, but then he was arrested a second time in 2025 and charged in this Court and scheduled to face a jury trial on July 20, 2026, on a one-count indictment alleging felon-in-possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). *See* Indictment, ECF No. 1; Scheduling Order (Mar. 17, 2026). Following a series of missteps by the U.S. Attorney's Office for the District of Columbia ("USAO-DC")—including *double booking* its line attorney for two trials scheduled to begin on the same day; knowing for *over nine months* about problems with an essential government witness but failing to make timely alternative plans; and ignoring defendant's *repeated requests* for discovery and *Brady* materials—the government realized in the lead up to the trial date, which had been proposed by the parties and adopted by the court four months earlier, that it is not ready. After first attempting to seek a continuance of "at

least 90 days," Gov't's Opposed Mot. to Continue Trial at 1 ("Gov't's Mot. Continue"), ECF No. 51, which was denied on Speedy Trial Act grounds, the government is now requesting dismissal without prejudice pursuant to Federal Rule of Criminal Procedure 48(a). *See* United States Mot. to Dismiss Indictment Without Prejudice ("Gov't's MTD"), ECF No. 67.

The missteps leading to the current posture of this case may be laid squarely at the feet of management at the USAO-DC. How else to explain double-booking the same Assistant U.S. Attorney ("AUSA-1") for two jury trials on the same day in this Court, without substituting in another line attorney for one of the trials? How else to explain that the assigned AUSA-1 needed supervisory permission to call the essential law enforcement witness necessary for the introduction of DNA evidence tying defendant to the gun at issue in the charge, yet was not alerted of that requirement by his supervisors until less than a month before trial? How else to explain that when supervisors were consulted by another AUSA ("AUSA-2") about the witness problem in mid-June 2026, efforts to re-do the DNA testing by collecting new buccal swabs from defendant did not occur until almost four weeks later at the pretrial conference held ten days before the scheduled trial date? How else to explain the recurring problems involving the same essential government witness in USAO-DC cases, including a prior case in this Court where the same issue also surfaced just before trial?

The present predicament boils down to this: The government cannot proceed to trial due to its own dilatory behavior and so grasps at Rule 48(a) to end-run the Court's denial of its continuance motion. The government has informed the Court that, after dismissal, it will be ready to re-prosecute "in approximately 90 days" at which time "this case can proceed to adjudication." Gov't's Reply in Supp. of MTD ("Gov't's Reply") at 7, ECF No. 71. Unsurprisingly, defendant, who has met nearly every court-imposed deadline, been under stringent pretrial supervision for

over a year, and diligently prepared for months in reliance on the parties' *jointly* proposed July 2026 trial date, vigorously opposes the government's motion and requests instead dismissal with prejudice. *See* Def.'s Opp'n to Gov't's MTD and Request for Dismissal with Prejudice ("Def.'s Opp'n"), ECF No. 70. For the reasons set forth below, the government's motion for without-prejudice dismissal is granted in part insofar as the motion seeks dismissal of the indictment, and denied in part as to its request that the dismissal be without prejudice. Accordingly, the indictment against defendant is dismissed with prejudice.

## I. BACKGROUND

The factual and procedural background relevant to resolving this motion to dismiss is described below.

### A. Factual Background

The factual background of this case has already been described in detail in a previous opinion denying defendant's motion to suppress tangible evidence. *See United States v. Thompson*, No. 25-cr-31 (BAH), 2026 WL 1917109, at *1-2 (D.D.C. July 3, 2026). Only the basic facts, as alleged by the government, relevant to understanding the pending motion to dismiss the indictment are summarized here.

On June 1, 2024, at around 11:18 p.m., two members of the Metropolitan Police Department's Robbery Suppression Unit, Sergeant Scott Possinger and Investigator Wilfredo Guzman, observed from their patrol vehicle a blue Audi parked in a parking lot directly in front of 323 53rd Street, NE, Washington, D.C. *Id*. at *1. As they pulled their patrol vehicle up to the parking lot, an individual (later identified as Dion Dempsey) exited from the driver's side and another individual (later identified as defendant) exited from the front passenger's side. *Id.* Dempsey and defendant both walked away from the parked Audi and the patrol vehicle toward a group of people standing in the apartment courtyard abutting the parking lot. *Id.* As Dempsey and

defendant walked away, the officers parked, exited their patrol vehicle, and approached the Audi to investigate. *Id.*

Sergeant Possinger shone his flashlight at the partially open window of the driver's side, and observed on the floor, partially under the driver's seat, a "large," "clear" Ziploc bag containing suspected marijuana exceeding two ounces, the legal limit for recreational marijuana consumption. *Id.* at *2 (citing Suppression Hearing Transcript (May 28, 2026) ("Suppression Hr'g Tr.") at 28:13-18, 23-25, ECF No. 48). Sergeant Possinger remarked to his colleague that there was "a bunch of weed" in the Audi, and asked Dempsey to "com[e] over here" and "talk." *Id.* (citing Suppression Hr'g, Gov't's Ex. 1, Possinger Body-Worn Camera Clip ("Possinger BWC") at 23:19:14-28).

Sergeant Possinger told Dempsey that because there was "more than 2 ounces of marijuana . . . [u]nder the seat," he was "going to search [the] vehicle." *Id.* (citing Possinger BWC at 23:19:36-46). Dempsey protested the search, and Sergeant Possinger heard Dempsey say, "No, I ain't got no weapons" in there. *Id.* (citing Possinger BWC at 23:19:44-46; Suppression Hr'g Tr. at 84:6-8). Dempsey also told Sergeant Possinger that his aunt was the registered owner of the vehicle, walking away from Sergeant Possinger to "get her." *Id.* (citing Possinger BWC at 23:20:00-05). Later investigation revealed that Dempsey was the registered owner of the vehicle. *Id.* As Sergeant Possinger opened the vehicle door to begin his search of the interior, he observed Dempsey "running" away. *Id.* (citing Possinger BWC at 23:20:20). Dempsey was subsequently arrested, and a search of the interior revealed a digital scale under the driver's seat with the marijuana, and a firearm in the glove box compartment. *Id.*

Upon Sergeant Possinger's discovery of the firearm on the passenger side, Investigator Guzman arrested defendant as well. *Id.* The marijuana was later field tested and weighed approximately 6.17 ounces, and a field test of the digital scale returned a positive indication for

the presence of Tetrahydrocannabinol, the psychoactive ingredient in cannabis. *Id.* The firearm was identified as a Glock model 30S .45 caliber, had an obliterated serial number, and was loaded. *Id.* Swabs from the firearm and magazine were further submitted for DNA testing. The DNA from the firearm yielded a mixture of five or more individuals and was not suitable for comparison, but the DNA results from the magazine were interpreted as originating from four individuals and are 130 trillion times more likely if defendant and three unknown, unrelated people were contributors than if four unknown, unrelated people were contributors. *Id.* Dempsey was excluded as a contributor. *Id.*

**B. Procedural History**

Eight months after the alleged offense conduct and defendant's arrest for gun possession was no-papered in D.C. Superior Court, Gov't's Mot. To Stay Def.'s Release and De Novo Review of Magistrate's Release Order at 7, ECF No. 12, defendant was charged by indictment in this Court, on January 28, 2025, with the crime of felon-in-possession, under 18 U.S.C. § 922(g)(1). Indictment, ECF No. 1. The government sought pretrial detention of defendant before the magistrate judge and this Court, but was unsuccessful. *See* Min. Entry (Jun. 6, 2025). Defendant was ordered released pretrial subject to stringent conditions, including a curfew, location monitoring, and restrictions from traveling outside of the District of Columbia. *See id.* (adopting magistrate judge's order setting conditions of release).

In September 2025, at the Court's direction, *see* Min. Order (Sept. 4, 2025), the parties proposed dates for trial, with the government proposing a trial in this matter between October and December 2025, while defendant, due to defense counsel's congested trial schedule, requested dates no earlier than March 2026, *see* parties' Joint Response, ECF No. 20, prompting the scheduling of a jury trial for April 20, 2026, *see* Scheduling Order (Sept. 12, 2025).

The government subsequently objected to defendant's request, several months later, to postpone the trial date from April 20, 2026, *see* Def.'s Mot. Continue Trial, ECF No. 22, and defendant's request for a continuance was denied, Min. Order (Jan. 28, 2026). On February 20, 2026, consistent with the Court's scheduling order to file all pretrial motions by February 27, 2026, *see* Min. Order (Sept. 12, 2025), defendant timely filed two pretrial motions and the government filed none.

On March 17, 2026, three days before the deadline for submission of the Joint Pretrial Statement, defendant requested—and the government consented to—a new trial date and pre-trial conference schedule given that one of defendant's counsel had left the Federal Public Defender's Office and the second of defendant's counsel was on extended medical leave. *See* Def.'s Unopposed Mot. to Continue Trial, ECF No. 31. The parties' jointly proposed schedule was accordingly adopted in full, setting the new trial date for July 20, 2026. *See* Scheduling Order (Mar. 17, 2026).

Leading up to the trial and after the completion of briefing on defendant's two pretrial motions, the Court, on May 19, 2026, denied defendant's motion to dismiss the indictment as violative of defendant's Second Amendment rights under the U.S. Constitution, *see* Min. Order (May 19, 2026), and on May 28, 2026 held an evidentiary hearing on defendant's motion to suppress tangible evidence, *see* Min. Entry (May 28, 2026). Following the hearing and at the parties' request, supplemental briefing on defendant's suppression motion was permitted. At this point, the government had made no mention of any issues with its witnesses either to the defense or the Court. Def.'s Opp'n to Gov't's Opposed Mot. to Continue Trial at 4-5 ("Def.'s Opp'n to Continuance"), ECF No. 59.

### *1. The Government's Motion To Continue July 20, 2026 Trial Date.*

On June 25, 2026, less than a month before trial and with supplemental briefing on defendant's suppression motion still in progress, the government suddenly moved to continue the trial for "at least 90 days." Gov't's Mot. Continue at 1. This short, four-page motion—containing no reference to, let alone analysis under, the Speedy Trial Act—stated that "undersigned counsel [AUSA-1] recently discovered that the Government is not in a position to offer the testimony of the officer who took the buccal swabs of Thompson and Dempsey in this case, herein referred to as 'Officer 1.'" *Id.* ¶ 5.[1] The following history was then summarized in connection with Officer 1, including communications with him that occurred on September 8 and 9, 2025.

Specifically, as recounted by AUSA-1, on September 8, 2025, in a telephone call with the USAO, Officer 1 indicated (1) "his displeasure in being subpoenaed for an upcoming trial and his displeasure that attorneys at the USAO were reaching out to him and his family members about his testimony," (2) "that if he were compelled to testify, he would testify that the D.C. Department of Forensic Sciences (DFS) did not have sterile environments," (3) "he would say more on the stand but did not specify what exactly he would say," and (4) "that his memory was fading and that having attorneys from the USAO reach out to him was a trigger for his memory issues." *Id.* ¶ 6. In a follow-up text message to an agent, Officer 1 stated "that he would try to call the assigned AUSA the following day when he was calmer, and that '[m]y emotions are getting the best of me right now and [I] can't get my thoughts together." *Id.* The next day, in another call with the USAO, Officer 1 explained, "that he was angry the day before and did not recall all his prior statements.

[1] Although the parties refer to the individual who took the buccal swabs as "Officer 1," a naming convention adopted here for consistency, the individual was in fact a "technician" with the Crime Scene Investigations Division of the D.C. Metropolitan Police Department ("MPD") when he collected the buccal swab from defendant in this case, and "retired" from MPD and was employed by a local Sheriff's Office at the time he made statements on September 8 and 9, 2025, that the USAO-DC considered problematic. Gov't's Response to Court's Min. Order, Ex. 1 at 1 (Letter, dated June 24, 2026, from AUSA-1 to defendant's counsel), ECF No. 53-1.

When asked specifically about his statement that the DFS did not have sterile environments, Officer 1 expressed concern that the AUSA was asking a trick question. Officer 1 repeated that he did not remember everything he said on September 8, 2025." *Id*. Based in part on these events, a complaint was filed, on September 17, 2025, with Officer 1's then law enforcement employer, "which resulted in an investigation into Officer 1's conduct. Officer 1 resigned from the agency prior to the conclusion of the investigation; however, the agency ultimately sustained unidentified violations against Officer 1 for violating agency policy and procedure." *Id*. The government further explained that, on January 9, 2026, the government spoke to an MPD Mobile Crime Lab Technician and an MPD officer, both of whom "described how firearms are processed in the District of Columbia and steps taken to ensure the integrity of the evidence, which is inconsistent with Officer 1's claim that firearms were being processed in unsanitary conditions." *Id.* ¶ 7. The government concluded that it "d[id] not intend to call Officer 1 as a witness at Thompson's trial," and "now is seeking to continue the trial date to obtain new buccal swabs from Thompson and Dempsey to compare those swabs to the swabs that were previously collected by Officer 1," which the government stated would require at least a 90 day continuance. *Id.* ¶¶ 8-9, 13.

Finding the government's bare-bones motion riddled with factual gaps, the Court the next day directed the government to respond to a number of questions about its motion to continue the long-scheduled trial from the date agreed-to by the government. These follow-up questions included: whether AUSA-1 was involved in the September 2025 communications with "Officer 1" described in the motion and, if not, "when did the AUSA currently assigned to this case become aware of the September 2025 communications with 'Officer 1'"; "[w]hat has caused the lengthy delay from September 2025 to June 25, 2026, the date of the filing of the motion, to bring this matter to the attention of defendant and the Court"; and "[w]hat can be done to expedite the

collection, testing, and analysis of any new buccal swabs from Thompson and Dempsey, given that the government still has over three weeks until trial on July 20, 2026, a trial date that was set three months ago." Min. Order (Jun. 26, 2026).

The government's response, filed on June 30, 2026, stated, among other things, that AUSA-1 was not "involved in any communications with Officer 1," and that "[t]he communication with Officer 1 in September 2025 that is referenced in the government's motion to continue pertained to an unrelated case." Gov't's Response to Court's Min. Order at 2, ECF No. 56. AUSA-1 further noted that he was assigned the case on August 20, 2025. As to when AUSA-1 became aware of issues purportedly precluding the government from calling Officer 1 as a witness, was a more convoluted story. The government's response explained that, due to AUSA-1's scheduling conflict in another case, *United States v. Robinson,* No. 25-cr-264-APM (D.D.C.), for which a new trial date of July 20, 2026 had been set on May 15, 2026, "on approximately May 22, 2026, the *Thompson* case was reassigned to AUSA[-2] for purposes of trial." *Id.* at 1-2. AUSA-2, in turn, requested chain of custody paperwork on June 11, 2026, "in response to a request from the defense," at which point he then realized that Officer 1 was "the officer who executed the buccal swabs of Defendant Thompson and Dion Dempsey," and, for reasons not explained in the government's response to the Court, AUSA-2 knew that Officer 1 was problematic for the government and could not be called. *Id.* at 3. AUSA-2 then "determin[ed] that there was no way to admit the DNA evidence in this case without Officer 1's testimony" and "there was no way to proceed without the DNA evidence in this case." *Id.*

At some point thereafter, USAO supervisors reassigned the case back to AUSA-1, despite this AUSA's commitment to a trial date on the same day in *United States v. Robinson*, prompting AUSA-1 to file, on June 25, 2026, the government's motion to continue trial. *Id.* at 4. The

response gave no indication as to what backup plans AUSA-1's supervisors made, when reassigning the *Thompson* case back to AUSA-1, to address the fact that AUSA-1 was also scheduled to begin trial on the same day before a different Judge. The response concluded by asserting that the recollection and retesting of the buccal swabs could not be expedited, and reiterated the government's "request to continue the trial date for at least 90 days." *Id.*

The same day that the government filed this response, June 30, 2026, was also the day the Joint Pretrial Statement was due, *see* Min. Order (Mar. 17, 2026), but instead of submitting that court-ordered filing, the government moved to vacate the pretrial deadlines, with no indication as to defendant's position on the motion. ECF No. 54. The government's motion to vacate pretrial deadlines was promptly denied, *see* Min. Order (Jul. 1, 2026), yet no timely Joint Pretrial Statement was ever filed.

On July 2, 2026, defendant filed a vigorous opposition to the government's motion to continue trial, citing the government's own failures to prosecute the case diligently and the burdens imposed on defendant, who "ha[d] been on pre-trial supervision in this matter for over a year, long enough for the entire duration of his wife's pregnancy with their first child, due next month [in August 2026]." Def.'s Opp'n to Continuance at 14. Any reply by the government to defendant's opposition to the motion to continue trial would have been due on July 9, 2026, *see* D.D.C. Local Crim. Rule 47(d), but no reply was ever filed.

On July 3, 2026, following completion of supplemental briefing for defendant's motion to suppress tangible evidence two days earlier, defendant's suppression motion was denied. *See United States v. Thompson*, No. 25-cr-31 (BAH), 2026 WL 1917109 (D.D.C. July 3, 2026), docketed Order, ECF No. 60; Memorandum Opinion, ECF No. 61. This resolved the last of the timely filed defense pre-trial motions.

On July 7, 2026, three days before the joint pretrial conference, with still no Joint Pretrial Statement filed or even a motion to extend the filing date in sight, the parties were directed to show cause, *inter alia*, why the "flagrant disregard" of the Court's March 17, 2026 Scheduling Order, *see* Min. Order (Mar. 17, 2026), and the Court's July 1, 2026 Minute Order denying the government's motion to vacate pretrial deadlines, *see* Min. Order (Jul. 1, 2026), should not be deemed willful and intentional and warrant sanctions, *see, e.g.*, 18 U.S.C. § 3162(b)(A)-(E). Min. Order (Jul. 7, 2026). Later that day, defense counsel filed the Joint Pretrial Statement. ECF No. 62.

On July 8, 2026, both parties responded to the Court's July 7 order to show cause. The parties' responses revealed that the government—the party with the burden of proof at trial and responsible for most of the information in the Joint Pretrial Statement—customarily provides the first draft of this document for defense counsel's review but utterly failed to do so here. Def.'s Response to Order of the Court at 3, ECF No. 64. As a result, defense counsel in this case belatedly drafted the Joint Pretrial Statement for the government's review, and accommodated both the government's request for more time to review and the government's further delays in submitting edits. *Id.*; *see also* Gov't's Response to the Court's Min. Order at 2-3, ECF No. 65 (government's explanation for delay does not conflict with defendant's representation).

***2. At July 10, 2026, Pretrial Conference, Government's Motion To Continue Trial Denied.***

By the date of the scheduled pretrial conference, on July 10, 2026, the government still had filed no reply to defendant's opposition to the government's motion to continue the trial date, relying solely on its four-page motion, which, as noted, failed to address the Speedy Trial Act at

all. This pending motion was, consequently, the first topic addressed at the pretrial conference. During the hearing, the government's multiple missteps in preparing for trial came to the forefront.

First, despite the originally scheduled trial date of April 20, 2026—which was continued shortly (just three days) before the original deadline for filing the Joint Pretrial Statement, to July 20, 2026—the government did not request from MPD complete chain of custody information relevant to the collection and processing of DNA evidence until June 11, 2026. In other words, even for the earlier scheduled trial date, the government had not been prepared for trial. In waiting this long, the government *thrice* ignored defense counsel's repeated and earlier requests for this information, with the first request made by defense counsel on May 8, 2026. Def.'s Opp'n to Continuance at 5 (defense counsel emailed AUSA-1 to request additional discovery, including "chain of custody documents," on May 8, May 12, and June 1, 2026, but all requests were ignored). AUSA-2, who was briefly assigned the case from May 22 to June 22, 2026, requested chain of custody information, at which point the government finally realized, too late and only due to AUSA-2's prior familiarity with Officer 1's issues, that Officer 1 was involved in this case.

Second, although the USAO had been aware since September 2025 of its unwillingness to sponsor Officer 1 as a witness, management at the USAO apparently did not take proactive steps then or at any other time to identify the pending cases involving Officer 1, to warn the line AUSAs on those cases, and to direct a redo of the buccal swabbing and DNA testing to avoid having to call Officer 1 as a chain of custody witness. Pretrial Conference Transcript (Jul. 10, 2026) ("Hr'g Tr.") 22:9-17, ECF No. 68. Rather, management appears only to have passively sent "a notification in September [2025] . . . to line assistants regarding Officer 1." *Id.* at 22:18-20. The USAO's failure to proactively screen matters involving Officer 1 has already caused issues right before trial in at least one other case on this Court alone, in December 2025. *See* Gov't's Mot. in

Limine Regarding Admissibility of DNA Swabs, *United States v. Fairnot*, No. 23-cr-24, ECF No. 118 (arguing, two weeks before trial, for the admission of DNA testimony as to the firearm and magazine without calling Officer 1 as a witness). Yet even after foreseeable issues regarding Officer 1 arose again in December 2025, management at the USAO still neglected to take any proactive steps to cure the USAO's perceived defects in cases touched by Officer 1, instead leaving it to the line AUSAs to uncover the problem during trial preparations.

Third, even when AUSA-2 learned of Officer 1's involvement in the case, no obvious guardrails set by the USAO alerted him of the potential witness issue, but rather his own experience from his practice in the Superior Court. Hr'g Tr. 44:12-16, 24-25 (AUSA-2: "I saw that the individual who did the buccal swabs was Officer 1 . . . . I did recognize that name as an individual who I was aware of from my practice in the Superior Court . . . . So I flagged that for a supervisor . . . ."). AUSA-2 explained that he recognized Officer 1 "as an individual who we would need supervisors to contact[,] . . . that is he was someone that the line prosecutors were not supposed to reach out to directly." *Id.* 49:17-20. Had AUSA-2 been unaware of issues with Officer 1 from his own prior experience, the process for such "flagging" remains entirely opaque, given the lack of any proactive action by USAO's management to ensure line AUSAs were alerted to the cases in which a law enforcement officer with issues as a testifying witness was involved, particularly in cases with charges resting largely on DNA evidence and the problematic witness was the first link in the DNA chain of custody.

Fourth, once AUSA-2 informed supervisors of the Officer 1 issue on June 14, 2026, the government waited over three weeks before obtaining a warrant for new buccal swabbing of defendant. *Id.* at 16:9-15 (warrant obtained on July 6). Then, the warrant was not executed until several days after that, on the day of the pretrial conference and ten days before the scheduled start

of trial—far too late to receive the test results in time. *Id.* 14:22-23 (AUSA-1: "[T]oday we took buccal swabs from Defendant Thompson."). Further, at the time of the pretrial conference, the government still had not taken buccal swabs from Dempsey. *Id.* at 15:17-20 (Court: "And so do you have the new buccal swab from Mr. Dempsey yet?" AUSA-1: "No, Your Honor. I'm working with [Dempsey's counsel] so that we can do it.").

Fifth, although the government summarily claimed that Officer 1 was "unavailable" as a witness, further questioning revealed that the government had made no attempts to contact Officer 1 about his willingness to testify in this case. *Id.* (AUSA-1: "I've had no contact with Officer 1, period."); 34:4-7 (Court: "So you've had no contact with him, so you don't know where he's living and whether he would be subject . . . easily to a subpoena. Is that right?" AUSA-1: "That is correct."). As this Court explained, however, the government "may not want to call [Officer 1] because [its] afraid he might be more damaging to the government's case than helpful, but that does not make a witness unavailable . . . as a legal matter." *Id.* 33:12-15. The Court informed the government that, in fact, in the very case giving rise to the September 2025 issues with Officer 1, *United States v. Loggins*, 24-cr-505-DLF (D.D.C.), "Officer 1 was, by name, listed on a witness list docketed [at] ECF 52," indicating that the government had represented Officer 1 to be an available government witness in that trial. *Id.* 34:18-20. Yet government counsel here was not aware of this. *Id.* 35:4-7 (The Court: "So basically you don't know if Officer 1 would qualify, as a legal matter, as an unavailable witness in this case." AUSA-1: "I do not, and I have not done the research. . . . I don't know anything about the [*Loggins*] case that you have [mentioned.]").

Sixth, relatedly, the government's explanation for declining to proceed to trial with Officer 1's testimony regarding the collection of buccal swabs from defendant and the driver of

the Audi is wholly insufficient. The government dumped on the Court and defense counsel a summary of statements Officer 1 made on September 8 and 9, 2025, to the USAO without pinpointing precisely the reasons why this person could not serve as a witness, or why these reasons were sufficient for the USAO to jeopardize a two-year investigation and prosecution of defendant on the eve of trial. Based on the record before the Court, at worst, Officer 1 was a witness who was reluctant to testify, having retired and moved on from MPD to another law enforcement agency and being distracted by an "ill mother." Gov't's Response to Court's Min. Order, Ex. 1 at 1, ECF No. 53-1 (Letter from AUSA-1 to defendant's counsel, reporting that "[f]ollowing the September 8, 2025 phone call, [Officer 1] again contacted the USAO and indicated that if he were to testify in the future, the USAO would need to provide him with a nurse to take care of his ill mother and a ride to the courthouse"). To be sure, Officer 1 also "indicated that if he were compelled to testify, he would testify that the D.C. Department of Forensic Sciences (DFS) did not have sterile environments," and possibly more critiques, *id.*, but the DNA at issue in this case was processed by a wholly different lab run by the Federal Bureau of Investigations ("FBI"), which the government could have pointed out on redirect to rehabilitate Officer 1. Further, Officer 1 expressed that he had memory issues, but the USAO never interviewed him in connection with this case to ascertain whether those issues persisted or were so severe he could not be called as a chain of custody witness at the scheduled trial.

Seventh, the government's responses at the hearing made apparent that by the time of the pretrial conference, supervisors at the USAO had staffed AUSA-1, *and only AUSA-1*, to proceed to trial in both *Thompson* before this Court and *Robinson* before another judge. In other words, the USAO assumed the Court would grant its eleventh-hour continuance motion and failed to develop any alternative staffing plan. Hr'g Tr. at 7:23-25, 8:1 (The Court: "[I]f [the continuance

motion is] denied, we're going to start trial on July 20 in this case. What are you going to do then?" AUSA-1: "If it's denied, Your Honor, respectfully, we cannot proceed . . . .").

Eighth, due to this double staffing issue, AUSA-1, who obviously could not try two cases at the same time, prepared for and proceeded to trial in the *Robinson* case while neglecting the *Thompson* case. As defense counsel succinctly summarized, and appears supported by the record, "the government has failed to file any motions in limine, failed to provide notice of any 404(b) evidence, failed to notice any convictions it would seek to admit under Rule 609, failed to provide expert disclosures pursuant to Federal Rule of Criminal Procedure 16(a)(1)(G), failed to respond to repeated discovery requests by the defense, failed to respond to specific *Brady* requests from the defense, and has been actively planning to appear in front of a different judge in a different trial on the same date as trial in this case." *Id.* 9:7-16. Indeed, at the hearing, defense counsel revealed that although the government now had the chain of custody information,"[t]he government ha[d] *still* not produced any chain of custody documents" to the defense, with just ten days left until trial. *Id.* 54:21-23 (emphasis added).

Analyzing the government's continuance motion under the Speedy Trial Act, this Court examined the statutory bases for excluding time, focusing on when "the ends of justice served outweigh the best interest of the public and the defendant in a speedier trial" pursuant to 18 U.S.C. § 3161(h)(7). *Id.* 84:21-24. Noting first that "[t]he Speedy Trial Act sets out several factors which the judge 'shall' . . . consider in determining whether to grant the continuance," *id.* 78:17-20, this Court highlighted the statutory instruction that "[n]o continuance . . . shall be granted because of . . . lack of diligent preparation or failure to obtain available witnesses on the part of the attorney for the government," *id.* 78:22-25 (quoting 18 U.S.C. § 3161(h)(7)(C)); *see also* 18 U.S.C. § 3161(h)(7)(B) (providing that courts must consider whether denying a

continuance would deny a party "the reasonable time necessary for effective preparation, *taking into account the exercise of due diligence*" (emphasis added)). This Court then determined that "the government's reasons for a continuance are a result of its own lack of diligent preparation, which is an impermissible reason to grant a continuance and exclude time under the Speedy Trial Act," *id.* 79:2-5, and found no other "basis under the Speedy Trial Act on which further exclusion of time should be granted," *id*. 84:23-24. This Court reasoned that the issues facing the government were "wholly of the government's own making"—"the government ha[d] failed to present any cognizable ends of justice arguments from an eleventh-hour continuance request in a trial when the government has been aware of [the Officer 1] problem since September 2025." *Id.* 85:15-17, 87:5-8. On the other side of the ledger, this Court found that a continuance would prejudice defendant, who "has been under a cloud of arrest and prosecution for alleged conduct from over two years ago," and who had been under pretrial supervision for over a year with "stringent restrictions on his liberty" and adverse effects on his personal and professional life. *Id.* 85:23-86:1. Further, a continuance beyond July 20, 2026 would have required defendant to bring on new counsel for the fourth time, as his present counsel would be out of the office or in trial through November 2026. *Id.* 85:23-86:22.

Accordingly, the government's motion to continue trial was denied. *Id.* 87:16-18 ("Trial is now scheduled, and still is scheduled, for July 20, 2026."). This Court also "discharge[d] the order to show cause issued on July 7, 2026, given the parties' explanations and apologies for not complying with the deadline for filing the joint pretrial statement," *id.* 88:1-3, and, at the government's request, rescheduled the pretrial conference for July 14, 2026, *id.* 91:5-9.

### *3. Government Motion To Dismiss The Indictment Without Prejudice, Vigorously Opposed By Defendant Who Seeks Dismissal With Prejudice.*

On July 13, 2026, AUSA-2 formally noticed his withdrawal of appearance from the case, leaving, as the only remaining counsel of record for the government, AUSA-1, who remained double booked to appear for trial on July 20, 2026 in *Robinson*. The same day, AUSA-1 moved to dismiss the indictment without prejudice, summarily stating in a brief two-page filing that "the government has determined that it can no longer sponsor the officer who collected the buccal swabs in this case" and "is not currently in a position to proceed to trial as scheduled." Gov't's MTD at 2. Defendant vigorously opposes and seeks dismissal of the indictment with prejudice. Def.'s Opp'n at 1. Due to the government's bare-bones analysis supporting its motion, expanded upon only in reply, *see* Gov't's Reply, defendant's request to file a sur-reply was granted, *see* Min. Order (Aug. 3, 2026). On August 4, 2026, the government's motion to dismiss without prejudice became ripe for review. *See* Def.'s Sur-Reply in Support of Dismissal with Prejudice ("Def.'s Sur-Reply"), ECF No. 74.

## II. LEGAL STANDARD

Federal Rule of Criminal Procedure 48(a) states that "[t]he government may, *with leave of court*, dismiss an indictment, information, or complaint." Fed. R. Crim. P. 48(a) (emphasis added). The "leave of court" requirement "obviously vest[s] some discretion in the court," *Rinaldi v. United States*, 434 U.S. 22, 29 n.15 (1977) (per curiam), albeit a "narrow one," *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 742 (D.C. Cir. 2016).

As the Supreme Court has explained, "[t]he principal object of the 'leave of court' requirement is . . . to protect a defendant against prosecutorial harassment, *e.g.*, charging, dismissing, and recharging, when the Government moves to dismiss an indictment over the defendant's objection." *Rinaldi*, 434 U.S. at 29 n.15; *United States v. Ammidown*, 497 F.2d 615,

620 (D.C. Cir. 1973) ("The primary purpose of the 'leave of court' requirement is to 'protect[] a defendant from harassment, through a prosecutor's charging, dismissing without having placed a defendant in jeopardy, and commencing another prosecution at a different time or place deemed more favorable to the prosecution.'"). The D.C. Circuit has further held that denial of a Rule 48(a) motion may also be warranted where the motion "is prompted by considerations clearly contrary to the public interest." *Rinaldi*, 434 U.S. at 29 n.15 (citing *Ammidown*, 497 F.2d at 620). As to this latter consideration, leave of court cannot be denied simply "because of a view that the defendant should stand trial notwithstanding the prosecution's desire to dismiss the charges, or a view that any remaining charges fail adequately to redress the gravity of the defendant's alleged conduct." *Fokker*, 818 F.3d at 742. Rather, the "public interest" inquiry turns, among other things, on a question of "fairness" to the defense and the prosecution. *Ammidown*, 497 F.2d at 622.

Notwithstanding the general presumption in favor of a no-prejudice dismissal, *see Fokker*, 818 F.3d at 741-42 (noting that "'the presumption of regularity' applies to prosecutorial decisions" and the Executive retains "primacy over criminal charging decisions"), Rule 48(a) does not "intend[] the trial court to serve merely as a rubber stamp for the prosecutor's decision," but rather imposes on the court "the role of guarding against abuse of prosecutorial discretion," *Ammidown*, 497 F.2d at 620. Put simply, the ultimate decision regarding whether to dismiss with or without prejudice depends upon the purpose sought to be achieved by the government and its effect on the accused. *Id.* at 622.

## III. DISCUSSION

Parties in this case both request dismissal of the indictment, but argue over whether the dismissal should be with or without prejudice. For the reasons discussed below, the indictment against defendant is dismissed *with* prejudice.

### A. The Government's Predicament is Wholly One of its Own Making, and the Public's Interest in the Fair Administration of Criminal Justice Weighs in Favor of Dismissal With Prejudice.

Defendant argues for dismissal with prejudice, pointing out that the government's inability to proceed to trial arises from its own mismanagement, missteps and procrastination. Permitting the government to "strategically escape" its own deficiencies using Rule 48(a), defendant contends, would undermine the fair administration of justice. Def.'s Opp'n at 13. The government, on this point, points to the general "public interest in having criminal cases adjudicated on the merits." Gov't's Reply at 9. This indisputable public interest in merits-based dispositions of criminal cases necessarily encompasses an implicit concomitant interest in the prompt and fair administration of criminal proceedings, and thus the public interest in accountability for criminal conduct is best served when the government is ready to prove the charges at trial on the date proposed by the parties and agreed to by the Court. Accordingly, when confronted with a government motion to dismiss an indictment, "the court will not be content with a mere conclusory statement by the prosecutor that dismissal is in the public interest, but will require a statement of reasons and underlying factual basis." *Ammidown*, 497 F.2d at 620.

Requests to dismiss charges without prejudice have been viewed unfavorably on this Court when the reason for the government's request is "to gain a position of advantage, or to escape from a position of less advantage in which it found itself as a result of its own election." *United States v. Poindexter*, 719 F. Supp. 6, 11 (D.D.C. 1989) (discussing *United States v. Salinas*, 693 F.2d 348, 353 (5th Cir. 1982)); *see, e.g.*, *United States v. Pitts*, 331 F.R.D. 199, 203 (D.D.C. 2019) ("[D]ismissing a case without prejudice [when the government is disadvantaged due to its own oversight] only to bring charges when the case is in a better posture for the government is precisely the type of strategic use of Rule 48 that the D.C. Circuit has proscribed. . . . The fair administration of justice does not countenance the use of such ploys." (citing *Ammidown*, 497 F.2d at 620));

*United States v. Borges*, 153 F. Supp. 3d 216, 220 (D.D.C. 2015) (dismissing with prejudice when the government's sole reason for seeking dismissal without prejudice was to avoid a problem with a key witness that the government had hoped would be cured at some later date, and to bring the case again under "more advantageous circumstances"(internal quotation marks omitted)); *United States v. Madzarac*, 678 F. Supp. 3d 42, 50, 52 (D.D.C. 2023) (concluding "the public interest would be best served by a dismissal with prejudice" because the Court was "convinced that the government pursued the case knowing it could not establish venue," in the hopes that defendant would waive venue, and when he did not, "mov[ing] to dismiss without prejudice to save itself from the tactical disadvantage of litigating a losing position").

In *United States v. Pitts*, for example, the court denied the government's request to dismiss charges without prejudice where, due to "oversight," the government "fail[ed] to test the DNA swabs from the gun recovered" despite having possession of that evidence for several months and receiving requests from the defendant for that evidence. 331 F.R.D. 199, 203 (D.D.C. 2019). Running up against the expiration of the Speedy Trial date, the government requested dismissal without prejudice to give itself more time to do the tests. The court dismissed with prejudice instead, observing that the government's "dissatisf[action] with the state of its case" and need to "salvage" the situation was the result of its own failures. *Id.* (finding that the government seeks to dismiss simply because it prefers to prosecute the defendant "at a different time . . . deemed more favorable to the prosecution" (quoting *Ammidown*, 497 F.2d at 620)). "[I]t would be contrary to the manifest public interest and amount to objective harassment to leave the threat of arrest and prosecution—for a third time—looming simply because the government seeks to cure its self-inflicted defects in this case." *Id.* at 205 (footnote omitted).

So too here. The government's motion to dismiss without prejudice arises wholly from problems of its own making, many of which reflect USAO management issues beyond the control of any single line-AUSA. The public interest would be ill-served in perpetuating the effects of these oversights by allowing the government to re-arrest defendant for a third time and re-do the prosecution.

To begin, the fallout from this case has revealed a systemic, management-level failure at the USAO to alert line attorneys promptly and proactively about law enforcement witness issues known by management within the office. The government seeks dismissal without prejudice because it realized, just weeks before trial, that one of its essential DNA law enforcement witnesses had, in September 2025, expressed a reluctance to testify and had made damaging comments about the sterility of the D.C. Department of Forensic Sciences in an unrelated case. This issue with Officer 1 arose a few days before the first trial date was scheduled this case, *see* Min. Order (Sept. 12, 2025) (setting trial for Apr. 20, 2025), over six months before the operative trial date was scheduled, *see* Min. Order (Mar. 17, 2026) (rescheduling trial for Jul. 20, 2026), and *ten months* before the operative trial date was scheduled to commence on July 20, 2026. In other words, the government's need to obtain new buccal swabs and DNA testing is triggered by events occurring and known within the USAO ten months ago. The fact that the USAO had known of Officer 1's issues for months and could have alerted the line attorneys in this case long before now is a problem of the government's making.

Indeed, this apparently is not the first time since September 2025 that the government's untimely discovery of Officer 1's involvement in a case has caused issues right before trial. *See* Gov't's Mot. in Limine Regarding Admissibility of DNA Swabs, *United States v. Fairnot*, No. 23-cr-28, ECF No. 118 (arguing, two weeks before trial, that Officer 1 need not be called as a witness

to admit DNA testimony). The Court can only conclude either that the USAO failed to have systems in place so that line prosecutors are made aware of problematic witnesses early on, or that the line prosecutors have been inadequately trained in using whatever systems are in place to uncover the issue in a timely manner while preparing for trial. Either way, the fault lies with the government.

Moreover, although the government clearly believes Officer 1's testimony may be more damaging than helpful to its case, the government has not demonstrated why Officer 1 is "unavailable" as a legal matter. Mere unwillingness by the government to call a potential witness for strategic reasons does not mean a witness is absent or unavailable. *See, e.g.*, *Lucas v. Chance*, 121 F. App'x 77, 80 (6th Cir. 2005) (holding that a witness is not "[u]navailab[le]" simply because he "may be hostile or reluctant"); *Nelson v. Farrey*, 874 F.2d 1222, 1230 (7th Cir. 1989) (noting that "a witness cannot be declared 'unavailable' simply because the prosecutor or [trial] court concludes that the witness might not want to testify"). Rather, under 18 U.S. Code § 3161(h)(3), which permits exclusions of Speedy Trial time for "[a]ny period of delay resulting from the absence or unavailability of . . . an essential witness," an essential witness is considered "unavailable" only where the witness's "whereabouts are known but his presence for trial cannot be obtained by due diligence or he resists appearing at or being returned for trial."

The government has not shown that Officer 1's whereabouts cannot be determined with due diligence, or that he is resisting appearing for trial. To the extent that the government's unwillingness to call Officer 1 stems from apprehension as to what he might say at trial, as Officer 1's statements in September 2025 suggested he harbored potentially negative views about DFS, this may be mitigated by the fact that the DNA in this case was analyzed by another lab entirely, the FBI lab. The bottom line, based on the record before the Court, is that nothing about

Officer 1's statements suggest that he would *resist* appearing for trial if subpoenaed, only that he may provide damaging testimony about DFS, have a poor memory, and may have hard feelings about the complaint filed against him when he was employed by another law enforcement agency. Indeed, the government—in the unrelated case where issues with Officer 1 first surfaced—nonetheless included Officer 1 on its trial witness list even after Officer 1's troubling communications on September 8 and 9, 2025. *See Loggins*, 24-cr-505, ECF No. 52 (filed Sept. 11, 2025). In contrast, the government here has not even contacted Officer 1 to interview him about his work on this case, much less tried to ask Officer 1 to appear as a witness. Hr'g Tr. 34:2-3 (AUSA-1: "I've had no contact with Officer 1, period.").

Nor has the government explained why Officer 1's views of DFS have any relevance to his willingness to testify in this case, when the buccal swabs were analyzed exclusively by the FBI. *See* Gov't's Mot. Continuance at 2 (recounting that defendant's and Dempsey's "buccal swabs . . . were collected, transferred to the FBI, and submitted into FBI evidence"; "[t]he firearm and magazine . . . swabs were also transferred to the FBI and submitted into FBI evidence"; "[t]he DNA evidence was submitted to the FBI Laboratory for testing"; and "the FBI Laboratory DNA Casework Unit issued a report"). It is entirely possible that Officer 1 would have been willing to authenticate the buccal swabs sent to the FBI in this case. In any event, nothing is barring the government from proceeding to trial without Officer 1, when it can bring in other evidence, such as defendant's close proximity to the firearm in the vehicle. Simply put, the government demands that its dismissal motion be granted without prejudice in order to re-prosecute later in hopes for better optics for the evidence presented at trial, not because it *could not* present its case to a jury on the scheduled trial date. Yet Rule 48(a) provides no refuge where the government seeks an entirely optional dismissal because it would prefer not to call an available witness whom it never

attempted to interview or rehabilitate. *See Pitts*, 331 F.R.D. at 204 (citation omitted) (dismissing with prejudice a "case in which the government could proceed to trial yet, for tactical reasons, has sought to defer prosecution"). The fact that the USAO had flagged Officer 1 across-the-board as a potential witness "the line prosecutors were not supposed to reach out to directly," Hr'g Tr. 49:20 (AUSA-2), coupled with the USAO's inability to articulate precisely why Officer 1 cannot be sponsored as a witness in this case, reinforces the conclusion that management, not any particular line attorney, is largely responsible for the missteps leading to the pending dismissal motion.

The government's delay in providing chain-of-custody documents and information about Officer 1 to defense counsel warrants further alarm. As defense counsel has summarized, by the time the government disclosed the issue about Officer 1, six weeks had passed from when defense counsel made explicit repeated requests for all reports and chain of custody documents, four months since the government's missed February 27 pretrial motions deadline (by which point it surely should have begun its trial preparations), five months since the government opposed defendant's request for a continuance due to reassignment of counsel (suggesting the government was preparing for trial), and nine months after the government first learned of the relevant information from Officer 1. Def.'s Opp'n to Continuance at 12. Yet even at the time of the pretrial conference, ten days before trial, the government *still* had not shared with defense counsel the chain-of-custody documents they requested. Hr'g Tr. 54:19-23 (Defense Counsel: "I do want to state too, we still don't have any chain of custody documents. So we requested these in May. The government has still not produced any chain of custody documents, and we repeatedly requested them."); *see also* Def.'s Opp'n at 4 (noting that the government only disclosed chain-of-custody materials in the evening after the pretrial conference).[2]

[2] The status of discovery both before and after the pretrial conference continues to be a slippery issue. In post-conference briefing, the parties appear to agree that the government has disclosed at least "some chain of custody

As if these blunders were not enough, USAO management decided to double book the same AUSA-1 for two trials on the same day. At the direction of his supervisors, AUSA-1 sought a continuance in this case with no alternative plan for trial if the motion was denied. Gov't's Response to Court's Min. Order at 3-4. AUSA-1's neglect of this case in favor of the other trial was readily apparent.[3] With just ten days before trial, the government had provided no motions in limine, no notice of any 404(b) evidence, no notice of any convictions it would seek to admit under Rule 609, no expert disclosures pursuant to Fed. R. Crim. P. 16(a)(1)(G), no responses to defendant's repeated discovery and *Brady* requests, and no draft of the Joint Pretrial Statement to defense counsel. Put bluntly by the defense, the government "has always treated dismissal as a fallback option in case its motion to continue were not granted." Def.'s Sur-Reply at 9. Such procedural gamesmanship to evade Speedy Trial Act requirements undermines the integrity of the judicial process and offends fundamental notions of fairness and justice. *See Pitts*, 331 F.R.D. at 203 (finding "the use of such ploys" contrary to the "fair administration of justice"); *Borges*, 153

discovery in the evening after the pretrial conference." Def.'s Opp'n at 4. The government, however, represents that it "is not aware of any outstanding reports prepared by Officer 1" and that it has "disclosed to counsel for the defendant the full DFS discovery file and other property and/or evidence reports related to this case." Gov't's Reply at 2 n.1. Defendant, to the contrary, responds that the government has not provided any of the following materials: "reports from buccal and firearm swabs, additional barcodes and MPD chain of custody documentation, inventory from vehicle tow, contact information for Officer 1, MPD investigative reports related to an investigation of Officer 1, any potentially false statements made by Officer 1, communications between Officer 1 and the government, government communications and reports related to Officer 1, USAO polices related to the handling of potentially tainted evidence, communications and underlying reports related to the local sheriff's office complaint regarding Officer 1, documentation showing no other witness was present during the processing conducted by Officer 1, and communications related to the timeline for processing of a new buccal swab." Def.'s Sur-Reply at 2-3 n.1. Whether any of defendant's requested documents even exist to be subject to discovery is not clear from the record, but in any event the current status of discovery would not affect the Court's determination as to the government's Rule 48(a) motion. At bottom, the government failed to request essential chain-of-custody information until mid-June 2026, sixteen months after indictment, when, as the government conceded at the pretrial conference, "[t]ypically" these documents are produced to the defense shortly after indictment. Hr'g Tr. at 52:12-14 (AUSA-1).

[3] The trial date of July 20, 2026, in the instant case was set on March 17, 2026, almost two months before the same trial date was set, on May 15, 2026, in the *Robinson* case, allowing ample time for the USAO to arrange for a trial prosecutor in both cases. *See* D.D.C. Local Criminal Rule 57.5(b)(1) ("That case which is first set to commence trial on a specific day will receive priority over cases which are later set to commence trial on that day. A continued case shall be treated as set as of the last setting date.").

F. Supp. 3d at 220 (finding government cannot strategically use Rule 48(a) to cure its own blunders by dismissing and re-prosecuting again under "more advantageous circumstances").

The government argues that *Ammidown*—in which the D.C. Circuit stated that Rule 48(a) authorized considerations of "public interest" and "fairness" to the parties, including but not limited to protection against prosecutorial harassment, 497 F.2d at 622—has been subsequently narrowed by the Supreme Court in *Rinaldi* and the D.C. Circuit in *Fokker*, which the government interprets as reading Rule 48(a) to permit only considerations of prosecutorial harassment. Gov't's Reply at 4. The government draws a distinction between protecting a defendant against prosecutorial *advantage* versus prosecutorial *harassment*, contending that only the latter triggers with-prejudice dismissal. *Id.*

The government's interpretation of *Ammidown* is unpersuasive. First, although the Supreme Court in *Rinaldi* held that the "principal object of the 'leave of court' requirement is apparently to protect a defendant against prosecutorial harassment," the Court went on to acknowledge that some circuits also have interpreted Rule 48 to "permit the court to deny a Government dismissal motion" if that motion "is prompted by considerations clearly contrary to the public interest," citing *Ammidown*. *Id.* n.15. After *Rinaldi*, the D.C. Circuit in *Fokker* cited favorably to *Ammidown* for other legal propositions, and did not otherwise declare *Ammidown* to be overbroad. *See Fokker*, 818 F.3d at 745, 746, 750. The government's attempt to paint *Ammidown* as bad law thus falls short. Second, the government draws too fine a line between prosecutorial advantage and prosecutorial harassment, especially on the facts of this case. The government's gamesmanship through dismissal to gain an optical advantage as to an essential witness it failed timely to secure, to circumvent Speedy Trial Act deadlines it could not get

extended, and to fix staffing issues caused by its own double-booking, is as much an "advantage" to the USAO as it is "harassment" to defendant.

The government's related argument that *Pitts* and *Borges*, decisions issued by other Judges on this Court discussed above and upon which defendant relies, were wrongly decided also falls flat. Gov't's Reply at 6-7. The government argues that both cases applied an impermissibly "expansive view" of Rule 48(a) under *Ammidown* and inconsistent with *Rinaldi* and *Fokker*, which "would preclude non-prejudicial dismissal whenever the Government aimed to re-bring a case under more favorable circumstances." *Id.* at 6. Yet neither *Pitts*, *Borges*, nor today's decision goes as far as the government claims. Notably, both *Pitts* (2019) and *Borges* (2015) were decided decades after *Rinaldi* (1977), and *Pitts* was decided after *Fokker* (2016). As Judge Lamberth recently explained in analyzing this line of case law, there is a difference between "a situation where the government asks to dismiss based on developing circumstances or legal theories" and a situation "involving the forbidden governmental purpose of escaping from a position of less advantage in which the government found itself as a result of its own election." *Madzarac*, 678 F. Supp. 3d at 50 (internal quotation marks omitted, alterations accepted). The court there compared a hypothetical where a "key witness . . . flees the country," to a situation where government "knew from the beginning of the case that the witness would be unavailable, pursued the case for years anyway, and then tried to dismiss without prejudice to preserve the possibility of recovering the witness in the future." *Id.* at 49. The former situation would likely result in a dismissal without prejudice, but the latter—as here—might very well lead to a dismissal with prejudice. *Id.*

Finally, the government's sojourn to a D.C. state court decision raising similar arguments fares no better. *See* Gov't's Reply at 4 (discussing *Workman v. United States*, 255 A.3d 971 (D.C. 2021)). In *Workman*—involving a different procedural posture in which the defendant was

convicted on re-indictment and appealed—the D.C. Court of Appeals held that the trial court did not abuse its discretion in *denying* defendant's request to dismiss the re-indictment *with* prejudice. *Id.* at 977. The appellate court reasoned that the trial court reasonably had dismissed the first indictment without prejudice to give the defendant more time to review "critical DNA evidence [shared by the government] just before trial," with the parties' "underst[anding] that dismissal without prejudice would permit the United States to reindict," and thus in re-indicting, "the United States had simply done what the trial court and the parties understood." *Id.* at 977. In its reasoning, the *Workman* Court did no more than decline to enact a "flat rule that the government engages in impermissible harassment any time it dismisses an indictment in the hope of later reindicting the defendant under more favorable circumstances." *Id.* Defendant, however, "has never argued for such a sweeping rule." Def.'s Sur-Reply at 6. Rather, as defendant persuasively argues, what matters is not just *what* the government seeks—dismissal without prejudice—but *why*. *Id.* The government's tactical maneuver to avoid self-inflicted problems goes well beyond the legitimate exercise of Executive discretion and amounts to a deliberate evasion of the Court's denial of a continuance and concomitant Speedy Trial Act deadlines.[4]

---

[4] Some circuits appear to have developed a narrower standard for evaluating Rule 48(a) motions, limiting the inquiry to whether the government is acting in "bad faith." *See United States v. Adams*, 777 F. Supp. 3d 185, 210 (S.D.N.Y. 2025) (collecting cases) (noting that some courts "have treated prosecutorial bad faith and the public interest as two sides of the same coin," whereas others, including this Court, "have spoken of the public interest in terms that go beyond the motive of the prosecutor"); *see, e.g.*, *United States v. B.G.G.*, 53 F.4th 1353, 1361 (11th Cir. 2022) (stating that "a finding of bad faith [is] required to overcome the presumption of good faith" afforded to prosecutorial decisions to dismiss); *United States v. Goodson*, 204 F.3d 508, 512 (4th Cir. 2000) ("[T]he court must grant the government's Rule 48(a) motion unless the court concludes that to grant it would be clearly contrary to manifest public interest, determined by whether the prosecutor's motion to dismiss was made in bad faith."). The D.C. Circuit, however, has not followed this bad-faith approach. *See, e.g.*, *United States v. Thorpe*, 148 F.4th 768, 772 (D.C. Cir. 2025) ("No such extraordinary circumstances [to deny dismissal under Rule 48(a)] appear to be present in this case, given that the motion was unopposed and there is no evidence the government acted improperly ***or*** in bad faith." (emphasis added)); *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 737-51 (D.C. Cir. 2016) (no mention of "bad faith" in Rule 48(a) analysis).

Consistent with D.C. Circuit precedent, the government here does not argue for limiting the inquiry to "bad faith" alone. *See* Gov't's Reply at 7 (arguing that "absent evidence that the government is seeking to dismiss an indictment in bad faith ***or*** for reasons clearly contrary to the public interest, a motion for leave to dismiss without prejudice should be granted" (emphasis added, capitalization altered)). Defendant notes that at least one circuit has

In short, where the government could have proceeded to trial, but instead strategically seeks dismissal to cure perceived weaknesses in its case of its own making, the public's interest in the fair administration of criminal justice weighs in favor of dismissal with prejudice.

### B. Dismissal Without Prejudice Would Result in Prosecutorial Harassment of Defendant.

In any event, considerations of prosecutorial harassment against defendant, which fit squarely within the realm of *Rinaldi* and *Fokker*, compels dismissal with prejudice here. *Rinaldi*, 434 U.S. at 29 n.15 (observing the court's responsibility under Rule 48(a) "to protect a defendant against prosecutorial harassment, *e.g.*, charging, dismissing, and recharging"); *Fokker*, 818 F.3d at 742 (emphasizing the Rule 48(a) inquiry into whether "dismissal is part of a scheme of 'prosecutorial harassment' of the defendant through repeated efforts to bring—and then dismiss—charges").

Defendant has been under a cloud of arrest and prosecution for alleged conduct from over two years ago. He has twice been arrested and brought to court, first to the D.C. Superior Court in 2024, and then again on charges in this Court in 2025. For over a year, defendant has been under pretrial supervision with stringent restrictions placed on his liberty. Defendant has complied with these restrictions, which have had significant effects on his personal and professional life. As defense counsel has recounted, "[u]ntil February and March of this year, Mr. Thompson was on GPS monitoring, a curfew of 11pm to 5am (and 8am on non-workdays) that impacted his ability

held that moving to dismiss as a means of avoiding a denial of a continuance can constitute bad faith, but defendant does not otherwise press the point. *See* Def.'s Sur-Reply n. 3 (contending only in a footnote that the government's actions "*could* be considered bad faith," and citing to *United States v. Hayden*, 860 F.2d 1483 (9th Cir. 1988) (emphasis in original)); *see Hayden*, 860 F.2d at 1488-89 (explaining that use of "the Rule 48(a) motion as a pretext to bypass [the court's] denial of the continuance" would be "a clear act of bad faith"). As neither party argued for application of the bad-faith standard, the issue need not be reached.

to work two jobs, and travel restrictions that impeded his ability to attend his pregnant wife's doctor's visits. During this period, Mr. Thompson has been working at least 15 hours and commuting some four hours every workday—a schedule that requires him to be away from home 5am to midnight." Def.'s Opp'n to Continuance at 13. "[H]aving an open case for well over a year has prevented Mr. Thompson from being promoted or pursuing employment," and "[h]e has been denied at least two jobs because of his active case and his electronic monitoring." *Id.* at 14. The difficulty in obtaining promotions or other employment with more humane work schedules in turn has prevented defendant from spending more time with his family, and caused defendant to miss "numerous important milestones for his children, including his daughter's prom." *Id.*

Defendant has planned his life around the parties' agreed-upon trial date. Among other things, defendant and his wife are "expecting their first child together [in August], which heavily factored into [defense] counsel's scheduling of and preparation for trial" for July 20, 2026. *Id.* at 14. Defense counsel, likewise with the expectation of a July 2026 trial in this case, made other commitments through November 2026 that would preclude him from representing defendant on the new timeline requested by the government. *Id.* at 15. As such, permitting the government to dismiss and re-charge would require defendant to bring on new counsel for a fourth time. *Id.*

Defendant has diligently prepared for trial since his arraignment in June 2025. Through his counsel, defendant has met virtually every court-ordered deadline, sent the government repeated requests for specific discovery and *Brady* materials, took the lead on drafting the Joint Pretrial Statement when the government failed to do so, and opposed successfully the government's eleventh-hour motion to continue trial. As this Court had reasoned in denying the government's continuance motion, "the government cannot, as defendant argues, benefit from their own procrastination, negligence, and training failures while causing significant prejudice to

a defendant who has . . . awaited trial for a year, [is] thoroughly prepared, and is ready to proceed to trial and put this case behind him." Hr'g Tr. 87:1-2.

Now, through no fault of defendant, *see supra* Part III.A, his year-long compliance with pretrial supervision and preparation for trial have come to naught. If the government's motion to dismiss without prejudice is granted, defendant faces the very likely possibility of being hauled *again* into court to face trial on these allegations—starting the process all over again. Indeed, the government itself asserts that "once new DNA testing is obtained," "the United States intends to resume its efforts" to prosecute defendant. Gov't's Reply at 7-8; *id.* at 8 (stating that it "fully intends to seek adjudication of this case"). As defendant persuasively contends, "[t]hat amounts, objectively, to harassment—and harassment that results from the government's desire to situate itself in a more advantageous circumstance to avoid the consequences of its own organizational failures, procrastination, and negligence." Def.'s Opp'n at 15; *see also Pitts*, 331 F.R.D. at 206 (finding that "[b]y requesting a third bite at the prosecutorial apple, with the hope that it will have a better case at a later date," the government seeks "exactly" to "harass" the defendant by "commencing another prosecution at a different time or place deemed more favorable to the prosecution") (citation omitted)).

The government's motion to dismiss the indictment without prejudice is denied. By the government's own estimates, (1) it needs "at least 90 days" to re-do the DNA testing and be ready for trial, Gov't's Mot. Continue at 1, *see also* Gov't's Response to Court's Min. Order at 4 (reiterating, in response to the Court's question "[w]hat can be done to expedite" matters, that the government still needs "at least 90 days"); while (2) the restarting of the Speedy Trial clock "leads to a new trial date by September 10, 2026," or 27 days from the date of this Memorandum Opinion, Gov't's Response to Court's Min. Order at 5. The government has in other words admitted that if

its motion to dismiss without prejudice is denied, it cannot try the case before the impending Speedy Trial deadline. Accordingly, the indictment is dismissed with prejudice. Going forward, the USAO would be well advised to reevaluate the systems it has in place to ensure that line AUSAs are not double booked for trials, are alerted promptly of identified law enforcement witness issues, and are timely sharing discovery and *Brady* information with the defense.

## IV. CONCLUSION

For the reasons above, the government's Motion to Dismiss Indictment Without Prejudice, ECF No. 67, is GRANTED IN PART to the extent the motion seeks dismissal of the indictment, and DENIED IN PART. The indictment against defendant is dismissed with prejudice. An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: August 14, 2026

**BERYL A. HOWELL**
United States District Judge